13-1624-cv
Loginovskaya v. Batratchenko, et al.

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2013

(Argued: January 8, 2014     Decided: September 4, 2014)

Docket No. 13-1624-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

LUDMILA LOGINOVSKAYA,

Plaintiff-Appellant,

- v.-

OLEG BATRATCHENKO, THOR UNITED CORP.,
THOR UNITED CORP. (NEVIS), THOR ASSET
MANAGEMENT INC., THOR REAL ESTATE
MANAGEMENT LLC, THOR OPTI-MAX LLC, THOR
CAPITAL LLC, THOR FUTURES LLC, THOR
REALTY LLC, THOR GUARANT REAL ESTATE
FUND, LTD. (BVI), THOR REAL ESTATE
MASTER FUND, LTD., THOR OPTIMA LLC, THOR
REALTY HOLDINGS LLC, JOHN DOES 1-20,
TATIANA SMIRNOVA, THOR OPTI-MAX FUND,
LTD.,

Defendants-Appellees.[*]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

---

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the caption above.

Before:                    JACOBS, LOHIER and DRONEY, <u>Circuit Judges</u>.

Ludmila Loginovskaya appeals from a judgment of the United States District Court for the Southern District of New York (Oetken, <u>J.</u>), dismissing her Amended Complaint for failure to state a claim under the Commodities Exchange Act, 7 U.S.C. § 1 <u>et seq.</u>, and declining to exercise supplemental jurisdiction over her remaining state law claims. We conclude that the presumption against extraterritorial effect and the domestic transaction test of <u>Morrison v. National Australia Bank Ltd.</u>, 561 U.S. 247, 130 S. Ct. 2869 (2010), apply to a private right of action brought under Section 22 of the Commodities Exchange Act. Affirmed.

Judge LOHIER dissents in a separate opinion.

> CHRISTOPHER M. EGLESON (Nancy Chung and Roxanne Tizravesh, <u>on the brief</u>), Akin Gump Strauss Hauer & Feld LLP, New York, N.Y., <u>for Plaintiff-Appellant</u>.
>
> JUDITH M. WALLACE (Gary D. Sesser and Alexander Malyshev, <u>on the brief</u>), Carter Ledyard & Milburn LLP, New York, N.Y., <u>for Defendants-Appellees</u>.

2

DENNIS JACOBS, <u>Circuit Judge</u>:

Ludmila Loginovskaya appeals from a judgment of the United States District Court for the Southern District of New York (Oetken, <u>J.</u>), dismissing, pursuant to Fed. R. Civ. P. 12(b)(6), her claims under the Commodities Exchange Act ("CEA"), 7 U.S.C. § 1 <u>et seq.</u>, and declining to exercise supplemental jurisdiction over her state law claims. The district court held that the domestic transaction test announced in <u>Morrison v. National Australia Bank Ltd.</u>, 561 U.S. 247, 130 S. Ct. 2869 (2010), applies to Loginovskaya's CEA claim, and that her Amended Complaint failed to adequately allege a domestic transaction. Because the district court dismissed Loginovskaya's only federal claim, it declined to exercise supplemental jurisdiction over her remaining state law claims. On appeal, Loginovskaya argues the district court erred in its application of <u>Morrison</u>.

Applying the reasoning of <u>Morrison</u>, we agree with the district court that a private right of action brought under CEA § 22 is limited to claims alleging a commodities transaction within the United States. Because Loginovskaya fails to allege a domestic commodities transaction, we affirm the district court's judgment. Because we affirm on the basis of § 22, we do not reach

3

Loginovskaya's argument regarding the territorial reach of the antifraud

provision in CEA § 4o.

## BACKGROUND[1]

The Thor Group, an international financial services organization based in

New York, manages investment programs, chiefly in commodities futures and

real estate.  Among the Thor Group entities are: 1) Thor Guarant, which invests

in real estate holdings and development; 2) Thor Optima, which invests in

options, futures, securities, and financial instruments; and 3) Thor Opti-Max,

which invests in the combined assets of Thor Guarant and Thor Optima.  Also

part of the Thor Group is Thor United, an entity that maintains "integrated

accounts" through which it invests in Thor Guarant, Thor Optima, and Thor

Opti-Max on behalf of investors.  Several Thor entities are registered participants

in the commodities markets as commodity pool operators or commodity trading

advisors.  Am. Compl., J.A. at 72-73.

---

[1] The following facts are derived entirely from the plaintiff's Amended
Complaint, which we presume to be true at this stage of the proceeding.  See, e.g.,
DeJesus v. HF Mgmt. Servs., LLC, 726 F.3d 85, 87 (2d Cir. 2013).

Defendant Oleg Batratchenko, a U.S. citizen resident in Moscow, is the Group's chief executive officer; in this role, he is a director for the three Thor programs. Defendant Tatiana Smirnova is a director for the Thor Opti-Max and Thor Guarant programs, and has served in various managerial capacities in the Thor entities.

Loginovskaya, a Russian citizen residing in Russia, was solicited by Batratchenko in January 2006 to invest in the Thor programs. Id. at 57. He provided her with brochures, investment memoranda, and other materials, written in Russian, describing the opportunity. Id. Batratchenko and his agents represented to her that she could withdraw her principal and returns at any time upon a set period of notice, that risk would be controlled, that the funds were managed by experienced experts in futures trading and investment (Peter Kambolin and Alexei Chekhlov), and that the programs would be audited regularly by reputable firms. Id. at 57-58.

Influenced by these representations, Loginovskaya entered into two investment contracts with Batratchenko and Thor United in 2006 and 2007. These contracts expressly incorporated the investment memoranda earlier provided to Loginovskaya. Pursuant to the contracts, Loginovskaya transferred a total of

5

$720,000 to Thor United's bank accounts in New York, which were subsequently drawn down to a remaining principal of $590,000.

Loginovskaya's account statements over ensuing years generally showed positive returns. Around May 2009, Loginovskaya sought to realize her gains and withdraw her remaining account funds. No money was forthcoming, and no further monthly account statement was dispatched until the statement dated November 2009, which reported for the first time that her investment had lost more than half its value since May. Loginovskaya again requested the return of her funds, unsuccessfully.

Investors were put off with false assurances that the programs were experiencing a temporary dip in liquidity, that cash would be available shortly, and that the Thor programs would be providing detailed financial statements to the investors. An April 2010 letter from Batratchenko falsely contended that, "due to onerous new regulations in the United States, investors could not withdraw their funds from the investment accounts without providing" burdensome documentation. Id. at 66 (emphasis omitted).

Since 2010, Loginovskaya has learned that the Thor programs used investors' funds in a manner inconsistent with the investment contracts. Between

6

2006 and 2009, Batratchenko caused the Thor entities to extend $40 million in unsecured loans to Atlant Capital Holdings LLC. Id. at 67. Atlant, which is not an affiliate of the Thor programs, makes equity investments in commercial and residential property in New York using funds loaned by Thor Real Estate Master Fund, Ltd. Atlant was undercapitalized, its real estate investments failed, the unsecured loans were defaulted, and the Thor entities could not recover Loginovskaya's funds. Batratchenko and Smirnova had personal financial interests in Atlant's real estate activity. See id. at 67-70.

This action was commenced in January 2012; the Amended Complaint, filed in June 2012, alleged that the defendants engaged in fraudulent conduct in violation of CEA § 4o, and in violation of state law. The district court granted defendants' motion to dismiss the CEA claim under Rule 12(b)(6) for failure to state a cause of action, on the ground that the CEA claim failed Morrison's domestic transaction test. See Loginovskaya v. Batratchenko, 936 F. Supp. 2d 357, 367-75 (S.D.N.Y. 2013). Because Loginovskaya failed to allege a plausible federal cause of action, the court declined to exercise supplemental jurisdiction over her state law claims. See id. at 375.

On appeal, Loginovskaya argues the district court erred in applying the Morrison test to her CEA claim.

## DISCUSSION

"We review <u>de novo</u> the grant of a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6)." <u>Harris v. Mills</u>, 572 F.3d 66, 71 (2d Cir. 2009). "We consider the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor." <u>Id.</u> "'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" <u>Cohen v. S.A.C. Trading Corp.</u>, 711 F.3d 353, 359 (2d Cir. 2013) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)).

### I

The CEA is a "remedial statute that serves the crucial purpose of protecting the innocent individual investor--who may know little about the intricacies and complexities of the commodities market--from being misled or deceived." <u>Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co.</u>, 310 F.3d 1321,

8

1329 (11th Cir. 2002). The CEA contains several anti-fraud provisions to fulfill this purpose. Among those is § 4o:

(1) It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6o(1).

A private right of action is afforded by CEA § 22, see 7 U.S.C. § 25(a)(1), limited to four circumstances, each of them explicitly transactional in nature: receiving trading advice for a fee, making a contract of sale of any commodity for future delivery or the payment of money to make such a contract, placing an order for purchase or sale of a commodity, or market manipulation in connection with a swap or contract for sale of a commodity. See id.; Klein & Co. Futures, Inc. v. Bd. of Trade of N.Y., 464 F.3d 255, 262 (2d Cir. 2006) ("Congress enacted CEA § 22 but enumerated the only circumstances under which a civil litigant could assert a private right of action for a violation of the CEA or CFTA regulations.").

9

An aggrieved party otherwise may seek recovery through an administrative proceeding at the Commodity Futures Trading Commission ("CFTC"). See 7 U.S.C. § 18.

To ascertain the territorial scope of CEA §§ 4o and 22, we consult the Supreme Court's opinion in Morrison, which decided whether § 10(b) of the Securities Exchange Act of 1934 ("SEA") applies extraterritorially. See generally 130 S. Ct. 2869. The Morrison Court relied on this canon of statutory construction: "'unless there is the affirmative intention of the Congress clearly expressed' to give a statute extraterritorial effect, 'we must presume it is primarily concerned with domestic conditions.'" Id. at 2877 (quoting EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991)). Thus, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." Id. at 2878.

Prior to Morrison, this Circuit applied an "effects or conducts" test to determine whether SEA § 10(b) applied to transactions outside the United States. Id. at 2878-80. The Supreme Court rejected that test as unpredictable and because it neglected the presumption against extraterritoriality: "Rather than guess anew in each case, we apply the presumption in all cases, preserving a stable

10

background against which Congress can legislate with predictable effects." Id. at 2881.

Morrison ascertained the territorial reach of § 10(b) in two steps. First, the Court considered whether Congress, by clear statement, overrode the presumption against extraterritoriality. Courts must presume a statute lacks extraterritorial effect "unless there is the affirmative intention of the Congress clearly expressed." Id. at 2877 (quotation marks omitted). The Court held there was no such "affirmative indication in the [SEA] that § 10(b) applies extraterritorially." Id. at 2883. The Court observed that references in text to "interstate commerce" or a "national public interest" in the global securities marketplace are insufficient to overcome the presumption. Id. at 2882. Moreover, "when a statute provides for *some* extraterritorial application, the presumption against extraterritoriality operates to limit *that provision* to its terms." Id. at 2883 (emphasis added).

As Morrison acknowledged, the applicability of the presumption at the first step is "not self-evidently dispositive," and "requires further analysis":

> For it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it

11

retreated to its kennel whenever *some* domestic activity is involved in the case.

Id. at 2884 (emphasis in original). Absent a clear statement by Congress that § 10(b) has extraterritorial effect, Morrison proceeded to a second inquiry: how the presumption affects the particular statutory provision in view of the "focus of congressional concern." Id. (quotation marks omitted).

As the Court observed, § 10(b) punishes "only deceptive conduct 'in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered.'" Id. (quoting 15 U.S.C. § 78j(b)). The focus of congressional concern was thus "not upon the place where the deception originated, but upon purchases and sales of securities in the United States." Id. Accordingly, the Court limited the territorial scope of SEA § 10(b) to domestic transactions: "purchase[s] or sale[s] . . . made in the United States, or involv[ing] a security listed on a domestic exchange."[2] Id. at 2886.

The Court expressly rejected an alternative test offered by the Solicitor General that would have weighed whether significant domestic conduct was

---

[2] Morrison did not further define a domestic transaction. This Circuit addressed that issue in Absolute Activist Value Master Fund Ltd. v. Ficeto. See generally 677 F.3d 60 (2d Cir. 2012).

material to a fraud's success.  Id.  Acknowledging that such a test would have

admirable purposes, the Court found no support for it in the statutory text.  Id.

Not incidentally, extension of the territorial reach of the provision would lead to

the United States becoming "the Shangri-La of class-action litigation for lawyers

representing those allegedly cheated in foreign securities markets."  Id.

## II

The CEA as a whole--and sections 4o and 22 in particular--is silent as to

extraterritorial reach.  See Starshinova v. Batratchenko, 931 F. Supp. 2d 478, 485-

86 (S.D.N.Y. 2013) (compiling pre-Morrison case law and holding there is no

basis to conclude the CEA applies abroad); In re LIBOR-Based Fin. Instruments

Antitrust Litig., 935 F. Supp. 2d 666, 696 (S.D.N.Y. 2013) (stating no indication of

extraterritorial effect in the text of the CEA nor its legislative history).  Given the

absence of any "affirmative intention" by Congress to give the CEA

extraterritorial effect, we must "presume it is primarily concerned with domestic

conditions."  Morrison, 130 S. Ct. at 2877.  We therefore proceed to consider the

"focus of congressional concern."  Id. at 2884.

13

## III

Loginovskaya's suit must satisfy the threshold requirement of CEA § 22 before reaching the merits of her § 4o fraud claim. In determining *how* the presumption against extraterritorial effect applies, we look to the focus of § 22: domestic conduct, domestic transactions, or some other phenomenon localized to the United States. In § 22, the "focus of congressional concern," Morrison, 130 S. Ct. at 2884, is clearly transactional. Section 22 allows a private right of action against a person whose violation of the CEA "result[s] from one or more of the transactions" listed in the statute: receiving trading advice *for a fee*; making a *contract of sale* or deposit in connection with *any order* to make such a contract; the *purchase, sale, or order* for a commodity interest; and market manipulation in connection with a *swap or contract of sale*. 7 U.S.C. § 25(a)(1). "The common thread of these four subdivisions is that they limit claims to those of a plaintiff *who actually traded* in the commodities market." Klein, 464 F.3d at 260 (emphasis added). Given that CEA § 22 limits the private right to suits over transactions, the suits must be based on transactions occurring in the territory of the United States.

"Traditionally, courts have looked to the securities laws when called upon to interpret similar provisions of the CEA." Saxe v. E.F. Hutton & Co., 789 F.2d 105, 109 (2d Cir. 1986). Therefore, Morrison's domestic transaction test in effect decides the territorial reach of CEA § 22. A private right of action exists only when a plaintiff shows that one of the four transactions listed in § 22 occurred within the United States.

Loginovskaya argues that Morrison governs substantive (conduct-regulating) provisions rather than procedural provisions such as § 22. Morrison, however, draws no such distinction, and holds that the presumption applies generally to "statutes." See 130 S. Ct. at 2877-78; 2881. The broad thrust of Morrison is actually to the contrary: the majority opinion reins in lower courts that were "disregard[ing] . . . the presumption against extraterritoriality" that had been "long and often recited in [Supreme Court] opinions." Id. at 2878. Morrison thus simplified and reinforced this canon of construction, and thereby discouraged courts from making fussy distinctions in deciding whether or not the presumption applies. Loginovskaya's argument urges us to ignore

15

<u>Morrison</u>'s course correction.[3]

Loginovskaya's proposed distinction in this context--between substantive provisions and those that only create a cause of action—-is also foreclosed by <u>Kiobel v. Royal Dutch Petroleum Co.</u>, 133 S. Ct. 1659, 1665 (2013). <u>Kiobel</u> applied the presumption against extraterritoriality to the Alien Tort Statute, which "provides district courts with jurisdiction to hear certain claims, but does not expressly provide any causes of action"; "[i]t does not directly regulate conduct or afford relief." <u>Id.</u> at 1664. Thus <u>Kiobel</u> (like <u>Morrison</u>) recognizes that a statutory private right of action reflects congressional choices over the role of the federal courts in adjudicating some claims and not others.

Our reading of CEA § 22 is further consistent with this Court's precedent regarding extraterritoriality. Saying that a private right of action requires a domestic transaction is not the same thing as applying the presumption based on

---

[3] In <u>Blazevska v. Raytheon Aircraft Co.</u>, the Ninth Circuit decided whether the presumption against extraterritorial effect applied to a procedural statute that "only regulates the ability of a party to seek compensation from . . . airplane manufacturers in American courts." 522 F.3d 948, 953 (2008). Because the statute was merely procedural and "not a statute governing the substantive standards involved in tort claims," <u>id.</u> at 953, the court held that the presumption did not apply, <u>id.</u> at 954-55. <u>Blazevska</u>, however, was decided prior to <u>Morrison</u> and, therefore, carries little (if any) clout.

"the identity of the defendant."[4] Balintulo v. Daimler AG, 727 F.3d 174, 189-90, n.24 (2d Cir. 2013). Rather, to bring a suit under § 22, the transaction at issue--the *conduct* underlying the suit--must have occurred within the United States. Moreover, applying a canon of construction equally to all statutory provisions is not the same thing as "improperly conflat[ing] the question whether a statute confers a private right of action with the question whether the statute's substantive prohibition reaches a particular form of conduct." Gomez-Perez v. Potter, 553 U.S. 474, 483 (2008).

As Loginovskaya points out, applying Morrison to CEA § 22 draws a distinction between private litigion and enforcement actions by the government. Such a result is not remarkable. See Morrison, 130 S. Ct. at 2894 n.12, 2895 (Stevens, J., dissenting) (noting differences between the scope of actions that may be brought by the SEC and those by private parties). This division is consistent with CEA § 4o's apparent focus on the persons who are regulated without regard to where the resulting transaction occurs. See Alexander v. Sandoval, 532 U.S. 275, 289 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a

---

[4] *Pace* the dissent.

particular class of persons." (quotation marks omitted)); see also SEC v. Gruss, 859 F. Supp. 2d 653, 663 (S.D.N.Y. 2012). Nor does this distinction (as Loginovskaya contends) set up different substantive standards of conduct based on whether the plaintiff is a private party or the government; the *substantive* standards of § 4o are the same regardless of who brings the claim. See United States v. Vilar, 729 F.3d 62, 74-75 (2d Cir. 2013). Nothing in this opinion precludes relief for a private party in these circumstances; the inability to bring a cause of action in federal court does not restrict the ability to bring a claim before the CFTC. See 7 U.S.C. § 18(a)(1) ("Any person complaining of any violation of any provision [of the CEA] . . . may . . . apply to the Commission for an order awarding [damages].").

To summarize, the CEA creates a private right of action for persons anywhere in the world who transact business in the United States, and does not open our courts to people who choose to do business elsewhere.

**IV**

In the context of SEA § 10(b), we explained that there are two ways to allege a "domestic transaction." See Absolute Activist, 677 F.3d at 68. First, "it is

18

sufficient for the plaintiff to allege that title to the [security] was transferred within the United States." Id. Second, a plaintiff may allege facts showing "that the parties incurred irrevocable liability within the United States: that is, that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security." Id.

Given our holding that Morrison applies to a private right of action under CEA § 22--and the parallels between the CEA and SEA--there is no reason why Absolute Activist's formulation should not apply here. Loginovskaya alleges her claim arises from the purchase, sale, or placing an order for the purchase or sale of an interest or participation in a commodity pool.[5] See 7 U.S.C. § 25(a)(1)(C)(iii). She must therefore demonstrate that the transfer of title or the point of irrevocable liability for such an interest occurred in the United States.

Loginovskaya argues that the Amended Complaint shows that title to her interest in Thor Opti-Max was transferred in New York. We disagree.

---

[5] Loginovskaya's Amended complaint also alleges she received trading advice for a fee. See 7 U.S.C. § 25(a)(1)(A). As the district court observed, however, there are no allegations in the complaint of Loginovskaya receiving trading advice. See 936 F. Supp. 2d at 373. We therefore consider only her allegations regarding the purchase or sale of an interest in a commodity pool.

19

Loginovskaya contracted directly with Thor United only. Am. Compl., J.A. at 60. According to the Investment Memoranda incorporated in the contract with Thor United, Thor United invested these assets in the Thor Programs and held them for the benefit of its investors. See S.D.N.Y. Dkt. No. 32 Ex. 1B ¶ 3.1. Thus title to the Thor programs was held by Thor United; title was not in the individual investor. See id. at ¶ 5.8.[6] All Loginovskaya purchased was an interest in Thor United. Nowhere does she allege that title to her Thor United shares was transferred within the United States.

Loginovskaya's complaint likewise fails to allege that Thor United incurred irrevocable liability within the United States. At all times, Loginovskaya resided in Russia. Batratchenko solicited her investment while in Russia using investment materials written in Russian. The investment contracts with Thor United were negotiated and signed in Russia. True, Thor United is incorporated

---

[6] Although the Investment Memoranda are not part of the complaint, we may consider documents which the complaint incorporates by reference or relies heavily upon. See, e.g., DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). Loginovskaya acknowledges that her complaint incorporates the Investment Memoranda by reference, though she does not concede the accuracy of the translations. Appellant Br. at 14, n.47. Even if we did not rely on the Investment Memoranda, however, the only plausible inference permitted by the complaint is that Loginovskaya invested in Thor United and gave Thor United discretion over her investment.

in New York; but "a party's residency or citizenship is irrelevant to the location of a given transaction." Absolute Activist, 677 F.3d at 70.[7] Russia (not the United States) is where Loginovskaya and the defendants reached a "meeting of the minds." Id. at 68; see also Vilar, 729 F.3d at 77-78 (holding a transaction was domestic because the contract negotiations, correspondence, and execution occurred in the United States).

Loginovskaya emphasizes that she was required to wire transfer her funds to Thor's bank account in New York. These transfers, however, were actions needed to carry out the transactions, and not the transactions themselves--which were previously entered into when the contracts were executed in Russia. The direction to wire transfer money to the United States is insufficient to demonstrate a domestic transaction. See Vilar, 729 F.3d at 77 n.10.

---

[7] Loginovskaya attempts to distinguish this portion of Absolute Activist by pointing out that the residency or citizenship of natural persons is different from corporate entities. See Appellant Br. at 60, n.185. She argues that, although natural persons can be physically present in a jurisdiction other than where they are resident, a corporation is only located in the jurisdiction where it exists as a creature of law. Taken to its logical conclusion, any transaction with a United States corporation would constitute a domestic transaction. We reject this argument because it would expand Morrison's transaction test beyond the scope of the "conduct and effects" test with which Morrison dispensed.

Similarly, the "safe harbor" provisions in the contracts were a part of the larger contract executed in Russia. These provisions permitted Loginovskaya fifteen days to freely withdraw her funds from Thor's New York bank account after her initial transfer. The end of the fifteen-day waiting period, however, was not the start of the transaction. Much like the direction to wire transfer the funds to Thor's New York account, these provisions merely implemented an aspect of a transaction that was executed in Russia.

## V

Loginovskaya argues that grafting <u>Morrison</u>'s domestic transaction test onto CEA § 22 is anomalous because § 4o reaches more broadly. The basis of her argument is that the "focus of congressional concern," <u>Morrison</u>, 130 S. Ct. at 2884, in CEA § 4o is on domestic commodities market participants--not domestic transactions. The contention that <u>Morrison</u>'s transaction test is inapplicable to § 4o's antifraud protection is not without merit. <u>See</u> <u>Loginovskaya</u>, 936 F. Supp. 2d at 369 (observing that "<u>Morrison</u>'s transaction test is not immediately applicable to § 4o"); <u>c.f.</u> CEA § 4o, 7 U.S.C. § 6o (protecting against "*prospective* clients or participants" (emphasis added)); <u>Morrison</u>, 130 S. Ct. at 2887

22

(distinguishing the wire fraud statute from SEA § 10(b) because the wire fraud statute has no requirement that the prohibited conduct be "'in connection with' any particular transaction or event"); Ebrahimi v. E.F. Hutton & Co., 852 F.2d 516, 519 (10th Cir. 1988) (noting that CEA § 4b, rather than § 4o, is "most closely analogous to the antifraud provision" of SEA § 10(b)); Gruss, 859 F. Supp. 2d at 662 (holding that Morrison's transaction test does not apply to Section 206 of the Investment Advisers Act of 1940 because its focus is on the investment advisor). But see Starshinova, 931 F. Supp. 2d at 486-87. Nevertheless, we do not have to decide how the presumption against extraterritorial effect defines the reach of § 4o. Our conclusion that Morrison's domestic transaction test applies to CEA § 22 is not anomalous; if § 4o regulates the conduct of domestic commodities market participants in other countries, it would seem Congress has allowed a remedy through the CFTC. See 7 U.S.C. § 18.

## CONCLUSION

While the CEA may reach and regulate the conduct of the Thor defendants, Loginovskaya cannot pursue her cause of action in federal court because: the presumption against extraterritorial effect applies to CEA § 22; that provision

23

requires a commodities transaction; and Loginovskaya has not alleged a

domestic commodities transaction.  The judgment is affirmed.

LOHIER, Circuit Judge, dissenting:

If we accept her allegations as true, Ludmila Loginovskaya in a sense never had a chance. Enticed by the array of investment opportunities in the vaunted commodities markets of the United States, she was the victim of an old-fashioned fraud that a more perceptive investor, or a United States regulator, might have identified from a mile away. The main individual perpetrator of the fraud, defendant Oleg Batratchenko, is a United States citizen registered as a "principal" of commodity pool operators and commodity trading advisors under the Commodity Exchange Act ("CEA" or "Act") and a member of the National Futures Association. Most of the Thor corporate defendants are based in the United States and several are registered under the Act as commodity pool operators or commodity trading advisors. At least one of the corporate defendants, Thor Opti-Max Fund, Ltd., is a registered commodity pool.

Batratchenko, as CEO of the Thor Group, first approached Loginovskaya in Moscow in 2006 and, with a series of misrepresentations about the nature of the Thor investment programs, convinced her to invest in the programs by sending nearly $400,000 to an account in New York. A second meeting, and a similar series of misrepresentations, convinced her to cough up another $320,000

investment. The defendants assured Loginovskaya that she could redeem her investment at any time and that the funds in two Thor programs would be invested in commodity futures using particular trading strategies—otherwise, they "would be placed in risk-free U.S. money market accounts when not engaged in such trading"; that a Columbia University professor, described as "highly experienced in futures trading," would manage the investments and conduct regular valuations; and that "[r]eputable international audit firms" were auditing the Thor programs. None of these claims were true, and the defendants unlawfully diverted Loginovskaya's money for their own use in the United States.

My colleagues in the majority will not dispute that the defendants' allegedly fraudulent acts were sufficiently domestic to fall within the scope of CEA § 4o, the Act's main antifraud provision,[1] notwithstanding the application

---

[1] Section 4o provides, in relevant part:

> (1) It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

of the presumption against extraterritoriality reiterated in <u>Morrison v. National Australia Bank Ltd.</u>, 561 U.S. 247 (2010). In other words, had Loginovskaya resided on Main Street, U.S.A. or Sutton Place, New York rather than in Surgut, Russia at the time she made her investments, we all agree that her suit would have been allowed to proceed: a large part of the defendants' scheme transpired in the United States, involved United States actors regulated by the CEA, and was premised on false promises to invest Loginovskaya's money in commodities markets in the United States, in violation of § 4o. I would start and end the <u>Morrison</u> inquiry there, and vacate the decision of the District Court.

Instead, the majority opinion affords an extra, unfounded layer of protection to the defendants by applying the presumption against extraterritoriality and the <u>Morrison</u> transaction test to § 22 of the CEA, which authorizes (and limits) private rights of action under the Act but does not

---

> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6o.

3

regulate any conduct.[2] Under the rule announced today, private victims of

commodities fraud will be required to allege a separate domestic commodities

[2] Section 22 provides, in relevant part:

(1) Any person (other than a registered entity or registered futures association) who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person—
(A) who received trading advice from such person for a fee;
(B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity) or any swap; or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract or any swap;
(C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of—
(i) an option subject to section 6c of this title (other than an option purchased or sold on a registered entity or other board of trade);
(ii) a contract subject to section 23 of this title; or
(iii) an interest or participation in a commodity pool; or
(iv) a swap; or
(D) who purchased or sold a contract referred to in subparagraph (B) hereof or swap if the violation constitutes—
(i) the use or employment of, or an attempt to use or employ, in connection with a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative device or contrivance in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010; or
(ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap.

7 U.S.C. § 25(a)(1).

transaction even if they adequately plead a violation of § 4o, which does not require such a transaction. In fashioning this new rule, the majority misunderstands both the commodities laws of the United States and the presumption against extraterritoriality. As I explain, the presumption has nothing to do with statutory provisions, like § 22, that merely define who may assert a private right of action.

I.     Section 22

"[The] canon of statutory interpretation known as the presumption against extraterritorial application . . . reflects the presumption that United States law governs domestically but does not rule the world." Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659, 1664 (2013) (quotation marks omitted). Absent clear congressional intent to the contrary, the presumption limits the application of our statutes regulating conduct to the territory of the United States. Accordingly, we "typically apply the presumption to discern whether an Act of Congress regulating conduct applies abroad." Id. (emphasis added); see also Morrison, 561 U.S. at 266–67 (focusing on the conduct regulated by § 10(b) of the Securities Exchange Act). But it was never meant to close our courts, as the majority opinion does, to legitimate claims that those laws have been violated.

5

In my view, <u>Kiobel</u>, on which the majority relies, actually endorses the distinction between "substantive provisions and those that only create a cause of action," Majority Op. at 16, and underscores that the presumption applies only to the former.  <u>Kiobel</u> explains that the jurisdictional grant in the Alien Tort Statute ("ATS") is "best read as having been enacted on the understanding that the common law would provide a cause of action for [a] modest number of international law violations," <u>Kiobel</u>, 133 S. Ct. at 1663 (alteration in original) (quotation marks omitted), while the statute itself permits courts to "craft remedies for the violation of new norms of international law," <u>id.</u> at 1664 (quotation marks omitted).  Relying on <u>Kiobel</u>'s description of the ATS's dual structure as both a jurisdictional grant and a substantive provision of law, we recently clarified that "the presumption against extraterritoriality applies to the <u>statute</u>, or at least the part of the ATS that 'carries with it an opportunity to develop common law,' and 'allows federal courts to recognize certain causes of action.'"  <u>Balintulo v. Daimler AG</u>, 727 F.3d 174, 191 (2d Cir. 2013) (emphasis in original) (citations omitted) (quoting <u>Sosa v. Alvarez-Machain</u>, 542 U.S. 692, 731 n.19 (2004), and <u>Kiobel</u>, 133 S. Ct. at 1664).  In other words, the ATS is a hybrid statute as it pertains to the presumption, in the sense that it both grants

6

jurisdiction for tort claims brought by non-citizens and permits our courts to "engage in common-law development," id., thereby regulating conduct.

As indicated above, unlike § 4o and the ATS, § 22 does not purport to regulate conduct, impose liability for particular actions, or define a plaintiff's claims under the CEA. It merely "limit[s] the categories of persons that can seek remedies under the statute," Klein & Co. Futures, Inc. v. Bd. of Trade of the City of N.Y., 464 F.3d 255, 260 (2d Cir. 2006) (emphasis added), and prescribes who can pursue a private action for violations of substantive provisions of the CEA. To maintain a private cause of action, of course, a private plaintiff must have participated in one or more of the commodities transactions listed in § 22(a)(1). But these transactions are defined in other, substantive provisions of the CEA that prohibit certain types of conduct, and § 22 requires that a private party claim a violation of one of these substantive provisions, like § 4o.

Overlooking this distinction and the central question whether § 4o reaches the defendants' alleged conduct, the majority opinion insists that the presumption must be applied "equally to all statutory provisions," Majority Op. at 16, and focuses on whether § 22's private right of action applies. This approach both ignores the Supreme Court's caution against "improperly

7

conflat[ing] the question whether a statute confers a private right of action with the question whether the statute's substantive prohibition reaches a particular form of conduct" and leads to "exceedingly strange results." Gomez-Perez v. Potter, 553 U.S. 474, 483 (2008).

A simple example illustrates one pitfall of the majority opinion's approach. Consider the jurisdictional statutes at 28 U.S.C. § 1331 and 18 U.S.C. § 3231. Although neither statute expressly rebuts the presumption, we have never dismissed a federal question suit involving actors or conduct abroad on the ground that § 1331 or § 3231 does not apply extraterritorially. Instead, we have consistently considered whether the substantive federal law giving rise to the action (or the prosecution) reaches the conduct in question. For the same reasons, it makes no sense to apply the presumption to § 22 when § 4o is the relevant, substantive federal provision that prohibits the defendants' alleged conduct in this case.

The majority opinion's approach also creates two sets of rules that depend solely on the identity of the party seeking to enforce § 4o: one for private parties located outside the United States and another for private parties located inside the United States and the Government. Because there was no evidence that

8

Congress intended it, we rejected a dual regime in <u>United States v. Vilar</u>, 729 F.3d

62, 74–75 (2d Cir. 2013), <u>cert. denied</u>, 134 S. Ct. 2684 (2014), which involved a

criminal prosecution under § 10(b) of the Securities Exchange Act, 15 U.S.C.

§ 78j(b).  There we warned against giving "the same statutory text different

meanings in different cases" depending on the identity of the party bringing suit.

<u>Id.</u> at 75.  The same simple principle applies here.  If a private party located

inside the United States—and, as the majority opinion implicitly acknowledges,

Majority Op. at 17, the Government—may bring an action to enforce § 4o against

the Thor defendants for their alleged fraud, then a private plaintiff located

outside the United States <u>a</u> <u>fortiori</u> may do the same, so long as that plaintiff

actually has been injured as a result of a transaction in § 22(a)(1), even if <u>that</u>

transaction occurred entirely abroad.  If the defendants' alleged actions are

regulated by § 4o, then any party with standing and statutory authority to do so

may bring an action to hold them liable.

To dampen the practical if not the legal effects of the problem its holding

creates, the majority opinion points to CEA § 14, 7 U.S.C. § 18, a provision that

permits private complaints to be made to the Commodity Futures Trading

Commission ("CFTC"), the civil government agency tasked with enforcing the

9

Act.[3] See Majority Op. at 18 ("[T]he inability to bring a cause of action [such as for fraud under § 4o] in federal court does not restrict the ability [of a private plaintiff] to bring a claim before the CFTC."). I share the majority's optimism that the CFTC can effectively police bad behavior. Having announced, however, that "the CEA creates a private right of action for persons anywhere in the world who transact business in the United States, and does not open our courts to people who choose to do business elsewhere," id., the majority cannot have it both ways. If the presumption against extraterritoriality applies equally to every statutory provision in the CEA, then it surely applies to § 14 as well. Under the majority's analysis, § 14, which is silent as to its extraterritorial application, would have no greater extraterritorial reach than § 4o or, for that matter, § 22, notwithstanding its broad statutory language. See Kiobel, 133 S. Ct. at 1665 ("[I]t is well established that generic terms like 'any' or 'every' do not rebut the presumption against extraterritoriality."). Of course, the majority's instinct is entirely correct: foreign private plaintiffs harmed by fraudulent commodities transactions in violation of § 4o should have an avenue of relief. In my view, that

---

[3] CEA § 14 provides, in relevant part: "Any person complaining of any violation of any provision of this chapter, or any rule, regulation, or order issued pursuant to this chapter, by any person who is registered under this chapter may, at any time within two years after the cause of action accrues, apply to the Commission for an order awarding [damages]." 7 U.S.C. § 18(a)(1).

10

avenue includes both § 14 and § 22, neither of which purports to regulate

conduct and, therefore, neither of which is subject to the presumption.

II.     Section 4o

As the District Court put it, "to hold that Morrison's presumption against

extraterritoriality applies [to § 4o] is quite different from grafting [Morrison's]

transaction test onto a statutory provision whose plain language appears to resist

such an interpretation."  Loginovskaya v. Batratchenko, 936 F. Supp. 2d 357, 369

(S.D.N.Y. 2013).  Lest there be any doubt, and even though the majority agrees

with me on this point, I want to explain briefly why Morrison's transaction test

does not apply to § 4o and Loginovskaya's allegations suffice to state a claim

under that provision.

By its terms, § 4o does not demand that a transaction occur; it prohibits

"fraud simpliciter, without any requirement that it be 'in connection with' any

particular transaction or event."  Morrison, 561 U.S. at 271–72 (discussing a

similarly worded provision of the federal wire fraud statute, 18 U.S.C. § 1343).  It

broadly forbids the use of any "device, scheme, or artifice to defraud" by any

United States-registered commodity trading advisor, commodity pool operator,

or associated person, whether or not that use culminates in a commodities

11

transaction. So in addition to fraudulent transactions, § 4o prohibits "any . . . practice, or course of business which operates as a fraud or deceit" and includes frauds against "prospective" clients, which obviously do not involve a transaction.[4]

Loginovskaya has sufficiently alleged a violation of § 4o. In arriving at this conclusion I am guided by the Supreme Court's interpretation of similarly structured statutes. For example, faced with a challenge to the extraterritorial application of the wire fraud statute in Pasquantino v. United States, 544 U.S. 349 (2005), the Court held that the petitioners' offense "was complete the moment they executed the scheme inside the United States" and that the locus of the petitioners' conduct in the United States provided the necessary "domestic element" that the wire fraud statute prescribed. Id. at 371. The Thor defendants' alleged "scheme or artifice to defraud" in violation of § 4o likewise was complete at least as soon as they diverted Loginovskaya's funds in New York.

---

[4] By contrast, the language of § 4b of the Act, 7 U.S.C. § 6b, mirrors the relevant transaction-focused text of § 10(b) of the Securities Exchange Act. Compare 7 U.S.C. § 6b(a) (targeting fraudulent conduct "in connection with any order to make, or the making of, any contract of sale of any commodity"), with 15 U.S.C. § 78j(b) (targeting the use of any manipulative or deceptive device "in connection with the purchase or sale of any security registered on a national securities exchange"). In view of § 4b's limitation to frauds that are "in connection with" a commodities transaction, the District Court's decision might have made sense had Loginovskaya brought her claim under § 4b rather than § 4o.

Loginovskaya alleges that their deceptive scheme was executed in part in the United States because the defendants issued investment memoranda and correspondence regarding the Thor programs from New York, Loginovskaya wired her investment funds to New York bank accounts, account statements were generated in New York, and the unauthorized investments occurred in the United States. See Joint App'x 49–50, 56, 74–75. These allegations, taken together, satisfy the territoriality requirement under § 4o.

This result—one the majority should have reached—reflects the expansive purpose of the CEA, which expressly aims to "protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets," and to preserve the integrity of the United States commodities markets. See 7 U.S.C. § 5 (emphasis added). Particularly when a vast amount of investment in the United States commodities markets emanates from abroad, including sovereign wealth funds, "all market participants" must mean all, without restriction to participants who engage in domestic transactions. The legislative history of the Act confirms that its "fundamental purpose . . . is to insure fair practice and honest dealing on the commodity exchanges," S. Rep. No. 93-1131, at 1, 14 (1974), reprinted in 1974 U.S.C.C.A.N. 5843, 5844, 5856, and to encourage

13

commodity pool operators, trading advisors, and other CEA-registered entities to engage in honest dealing that reflects well on the commodities markets, S. Rep. No. 95-850, at 12-13 (1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 2087, 2101 (discussing the trend in federal regulation toward "encouraging honest and sound dealing and strengthening public confidence in the nation's rapidly expanding futures markets").  Similarly, § 4l of the Act states that "the activities of commodity trading advisors and commodity pool operators are affected with a national public interest."  7 U.S.C. § 6l.  The Act's primary focus is on the regulated commodity entities—the market's ambassadors of sorts—not on individual transactions.

For these reasons I respectfully dissent.