*Prime International Trading Ltd., et al., v. BP PLC, et al.*

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2018

No. 17-2233

PRIME INTERNATIONAL TRADING, LTD., WHITE OAKS FUND LP, KEVIN MCDONNELL, ANTHONY INSINGA, ROBERT MICHIELS, JOHN DEVIVO, NEIL TAYLOR, AARON SCHINDLER, PORT 22, LLC, ATLANTIC TRADING USA, LLC, AND XAVIER LAURENS,

*Plaintiffs-Appellants*,

*v.*

BP P.L.C., TRAFIGURA BEHEER B.V., TRAFIGURA AG, PHIBRO TRADING L.L.C., VITOL S.A., MERCURIA ENERGY TRADING S.A., HESS ENERGY TRADING COMPANY, LLC, STATOIL US HOLDINGS INC., SHELL TRADING US COMPANY, BP AMERICA, INC., VITOL, INC., BP CORPORATION NORTH AMERICA, INC., MERCURIA ENERGY TRADING, INC., MORGAN STANLEY CAPITAL GROUP INC., PHIBRO COMMODITIES LTD., SHELL INTERNATIONAL TRADING AND SHIPPING COMPANY LIMITED, STATOIL ASA, AND ROYAL DUTCH SHELL PLC,

*Defendants-Appellees.*[+]

---

[+] The Clerk of Court is respectfully directed to amend the official caption as listed above.

ARGUED: DECEMBER 10, 2018
DECIDED: AUGUST 29, 2019

Before:        JACOBS, SULLIVAN, *Circuit Judges*, and KORMAN, *District Judge*[*]

Appeal from a judgment of the United States District Court for the Southern District of New York (Carter, *J.*,) dismissing Plaintiffs-Appellants' claims for lack of personal jurisdiction as to Defendant-Appellee Shell International Trading and Shipping Company Limited, for lack of jurisdiction under the Foreign Sovereign Immunities Act as to Defendant-Appellee Statoil ASA, and for failure to state a claim as to all claims. Plaintiffs-Appellants argue that the district court erred in concluding that their claims under the Commodity Exchange Act were impermissibly extraterritorial. Plaintiffs-Appellants also contend that the district court erred in dismissing their Sherman Act claims, in concluding that the court lacked personal jurisdiction over Defendant-Appellee Shell International Trading and Shipping Company Limited, and in dismissing claims against Defendant-Appellee Statoil ASA under the Foreign Sovereign Immunities Act. We disagree. Accordingly, we **AFFIRM** the district court's dismissal of Plaintiffs-Appellants' Commodity Exchange Act claims in this opinion, and **AFFIRM** the dismissal as to all other Defendants-Appellees and all other claims in a separately filed summary order.

DAVID E. KOVEL (Andrew M. McNeela *on the brief*), Kirby McInerney LLP, New York, NY, *for Plaintiffs-Appellants*.

RICHARD C. PEPPERMAN (Daryl Libow, Amanda Davidoff, Austin L. Raynor *on the brief*), Sullivan & Cromwell LLP, New York, NY *for Defendants-Appellees BP PLC, BP America, Inc. and BP Corporation North America, Inc.*

---

[*] Judge Edward R. Korman, of the United States District Court for the Eastern District of New York, sitting by designation.

DAVID B. SALMONS (Steven A. Reed, R. Brenda Fee, Michael E. Kenneally, *on the brief*) Morgan, Lewis & Bockius LLP, Philadelphia, PA *for Defendant-Appellee Shell International Trading and Shipping Company Limited*.

PERRY A. LANGE (David S. Lesser *on the brief*) Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC *for Defendant-Appellee Statoil ASA*.

RICHARD J. SULLIVAN, *Circuit Judge*:

This appeal requires us to decide whether alleged misconduct tied to the trading of crude oil extracted from Europe's North Sea constitutes an impermissibly extraterritorial application of the Commodity Exchange Act. For the reasons set forth below, we find that it does, and therefore affirm the dismissal of Plaintiffs-Appellants' claims.

## I. BACKGROUND

Plaintiffs-Appellants ("Plaintiffs")[1] are individuals and entities who traded futures and derivatives contracts pegged to North Sea oil – also known as Brent crude – on the Intercontinental Exchange Futures Europe ("ICE Futures Europe")

---

[1] Plaintiffs-Appellants are: Prime International Trading, Ltd., White Oaks Fund LP, Kevin McDonnell, Anthony Insinga, Robert Michiels, John Devivo, Neil Taylor, Aaron Schindler, Port 22, LLC, Atlantic Trading USA, LLC, and Xavier Laurens.

and the New York Mercantile Exchange ("NYMEX") between 2002 and 2015 (the "Class Period").

Defendants-Appellees ("Defendants")[2] are a diverse group of entities involved in various aspects of the production of Brent crude. In addition to producing, refining, and distributing Brent crude, Defendants also purchase and sell Brent crude on the physical market and trade Brent-crude-based futures contracts on global derivatives markets.

## A. Brent Crude Physical Market

Brent crude is extracted from the North Sea of Europe, and refers to oil pulled from four fields in the region: Brent, Forties, Oseberg, and Ekofisk (collectively, "BFOE"). The price of Brent crude serves as the benchmark for two-thirds of the world's internationally-traded crude.

Following extraction, Brent crude is delivered via pipeline to ports in Europe where it is loaded onto ships for delivery. These physical cargoes are bought and sold through private, over-the-counter ("OTC") transactions between

---

[2] Defendants-Appellees are: BP p.l.c., Trafigura Beheer B.V., Trafigura AG, Phibro Trading L.L.C., Vitol S.A., Mercuria Energy Trading S.A., Hess Energy Trading Company, LLC, Statoil US Holdings Inc., Shell Trading US Company, BP America, Inc., Vitol, Inc., BP Corporation North America, Inc., Mercuria Energy Trading, Inc., Morgan Stanley Capital Group Inc., Phibro Commodities Ltd., Shell International Trading and Shipping Company Limited ("STASCO"), Statoil ASA ("Statoil"), and Royal Dutch Shell Plc.

4

producers, refiners, and traders.  Because these physical transactions are private and do not occur on an open exchange, the price of Brent crude is not immediately available to the public.  Instead, price-reporting agencies collect information about transactions from market participants and report it to the consuming public.

B.  Platts and the Dated Brent Assessment

Platts is a prominent London-based price-reporting agency that collects information from market participants regarding their physical Brent crude transactions, analyzes that data to compute benchmark prices, and publishes those prices in real-time price reports as well as various end-of-day price assessments. The price reports track several different submarkets in the Brent crude market, but the "primary pricing benchmark"—widely regarded as the "spot" price for Brent crude – is the "Dated Brent Assessment."

The Dated Brent Assessment tracks physical cargoes of North Sea crude oil that have been assigned specific delivery dates.  Rather than averaging the prices of the four grades of Brent crude, the Dated Brent Assessment is based on the lowest price among the four grades, and is calculated each day during the assessment period.  Platts uses a Market-on-Close ("MOC") methodology, under which Platts tracks all Brent crude trading activity during the day, but weighs

most heavily the bids, offers, and transactions that occur at the end of each trading day, from 4:00 to 4:30 P.M. GMT.

Although Platts relies on market participants to voluntarily self-report their private transactions in order to create and publish the Dated Brent Assessment, they do not just mechanically recite the reported trade activity. Instead, Platts exercises its own discretion to accept or reject transactional data, and makes this assessment based on the reliability, accuracy, and consistency of such data. At the end of the day, Platts' goal in publishing the Dated Brent Assessment is to accurately reflect market prices and to avoid distortion or artificiality.[3]

## C. Brent Futures Market

Plaintiffs focus their claims on Brent-related futures and derivatives contracts ("Brent Futures"), which are primarily traded on two exchanges: NYMEX and ICE Futures Europe. NYMEX is a U.S.-based commodity futures exchange, while ICE Futures Europe is a London-based exchange. Plaintiffs and other market participants trade on both exchanges. The most heavily traded Brent Futures contract is the "ICE Brent Futures Contract," which has a corollary

---

[3] Indeed, according to its website, Platts "makes every effort to detect anomalous market behaviors and act swiftly to ensure these do not undermine the integrity of its assessments." JA 735.

contract on the NYMEX. These contracts stop trading, or "expire," approximately two weeks before the delivery month. If a futures contract is not offset before it expires, the contract is cash-settled. In other words, the in-the-money counterparty receives the cash value of the contract rather than the underlying asset itself.

Brent Futures traded on ICE Futures Europe ("ICE Brent Futures") are cash-settled based on an established benchmark known as the ICE Brent Index. Brent Futures traded on the NYMEX, in turn, settle at expiration to the price of ICE Brent Futures. Unlike the Dated Brent Assessment – which Platts calculates based on prices for the least expensive BFOE grade of Brent cargoes – the ICE Brent Index is calculated based on the *entire* BFOE market of physical Brent cargoes. In addition, the ICE Brent Index incorporates an average of certain designated price-reporting assessments, one of which, Plaintiffs allege, is the Dated Brent Assessment.

Beyond this incorporation, Plaintiffs provide several other points of support for their claim of a "direct[] link" between Brent Futures settlement prices and the Dated Brent Assessment. Specifically, they contend that the "ICE Brent Futures Contracts prices rarely deviate from the Dated Brent Assessment by more than 1%

7

at expiration," and that "changes in the Dated Brent Assessment directly impact[] Brent Futures prices."

## D. The Alleged Manipulation

Plaintiffs allege that Defendants conspired to manipulate, and did in fact manipulate, the market for physical Brent crude and Brent Futures by executing fraudulent bids, offers, and transactions in the underlying physical Brent crude market over the course of the Class Period. Defendants allegedly conducted these trades during the MOC window and then systematically reported the artificial transactions to Platts with the intention of manipulating the Dated Brent Assessment. According the Plaintiffs, Defendants' aim in doing so was "to benefit their physical Brent and Brent Futures positions," while the consequent manipulation of Brent Futures prices caused Plaintiffs to suffer economic loss because they transacted in Brent Futures during this time.

Plaintiffs' claim involves a causal chain that can be summarized as follows: Defendants engaged in artificial trades of physical Brent crude in foreign markets; Defendants systematically reported the artificial trade data to Platts; Platts reviewed and incorporated the fraudulent data into its calculation of the Dated Brent Assessment; ICE Futures Europe in turn incorporated the manipulated

8

Dated Brent Assessment into the ICE Brent Index; the manipulated ICE Brent Index was used to settle Brent Futures that were traded on both the London-based ICE Futures Europe and the U.S.-based NYMEX; as a result, Brent Futures traded and settled at artificial prices, causing economic loss to traders such as Plaintiffs.

Plaintiffs – as they acknowledge – "do not allege a single overarching conspiracy among all Defendants for the full Class Period," nor do they allege that the physical Brent crude market was monopolized by all Defendants simultaneously. Moreover, Plaintiffs do not assert that Defendants engaged in any manipulative trading on NYMEX or ICE Futures Europe. Rather, Plaintiffs limit the focus of their claim to Defendants' foreign physical market transactions, arguing that these transactions initiated a chain of events that caused ripple effects across global commodities markets.

## B. Procedural History

In 2013, Plaintiffs filed various independent cases against Defendants. Those cases were consolidated and transferred to the Southern District of New York (Carter, *J.*) in October 2013. Defendants filed an Amended Complaint on July 3, 2014, and filed a Second Amended Complaint ("SAC") on February 27, 2015. In the SAC, Plaintiffs asserted claims under (1) Sections 6(c)(1) and 9(a)(2) of the

9

Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 9(1)(a), 13(a)(2), including derivative claims for *respondeat superior* and for aiding and abetting, *see* 7 U.S.C. §§ 2(a)(1)(B), 25(a)(1)[4]; (2) Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; and (3) the common law for unjust enrichment. On July 28, 2014, Defendants Statoil and STASCO individually filed motions to dismiss based, respectively, on lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). That same day, all Defendants moved to dismiss all claims made in the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6).

The district court granted Statoil's motion to dismiss for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act, and granted STATSCO's motion to dismiss for lack of personal jurisdiction. Additionally, the district court granted the remaining Defendants' joint motion to dismiss all the claims in the SAC on the grounds that (1) Plaintiffs did not allege antitrust standing on their Sherman Act claims, and (2) their claims under the CEA were impermissibly extraterritorial. Plaintiffs filed a timely notice of appeal.[5]

---

[4] Section 22 of the CEA, 7 U.S.C. § 25, gives Plaintiffs a private right of action to sue for these violations.

[5] In this opinion, we only address Plaintiffs' appeal of the dismissal of their CEA claims. We separately address the dismissal of Plaintiffs' Sherman Act claims, as well as the dismissal of

## II. Standard of Review and Jurisdiction

"We review *de novo* the grant of a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6)." *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). We have jurisdiction under 28 U.S.C. § 1291.

## III. Discussion

The CEA is a "remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1329 (11th Cir. 2002). This case implicates two antifraud provisions of the CEA. Section 6(c)(1) of the CEA makes it "unlawful for any person . . . to use or employ, . . . in connection with any swap, or a contract of sale of any commodity, . . . any manipulative or deceptive device." 7 U.S.C. § 9(a)(1). Additionally, Section 9(a)(2) proscribes "manipulat[ing] or attempt[ing] to manipulate the price of any commodity in interstate commerce." 7 U.S.C. § 13(a)(2). Plaintiffs seek to enforce these substantive provisions of the CEA through the Act's private right of action,

Statoil and STASCO on other grounds, in a summary order issued simultaneously with this opinion. Plaintiffs do not appeal the dismissal of their unjust enrichment claim.

11

which permits a party to bring suit against a person whose violation of the CEA "result[s] from one or more of the transactions" listed in the statute. *See* 7 U.S.C. § 25(a)(1). At bottom, this case centers on our interpretation of the CEA – specifically, whether it permits suit against Defendants for alleged manipulative conduct that transpired in Europe.

We interpret the CEA in light of the presumption against extraterritoriality, a canon of statutory interpretation that is a "basic premise of our legal system." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016); *see also United States v. Palmer*, 3 Wheat. 610, 631 (1818) (Marshall, C.J.) ("[G]eneral words must . . . be limited to cases within the jurisdiction of the state"); Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 268 (2012). "Absent clearly expressed congressional intent to the contrary," federal laws must be "construed to have only domestic application." *RJR Nabisco*, 136 S. Ct. at 2100. This reflects the "commonsense notion that Congress generally legislates with domestic concerns in mind," *Smith v. United States*, 507 U.S. 197, 204 n.5 (1993), and acts to "protect against unintended clashes between our laws and those of other nations which could result in international discord," *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991).

12

Generally, courts engage in a "two-step framework for analyzing extraterritoriality issues." *RJR Nabisco*, 136 S. Ct. at 2101. First, because there must be an "affirmative intention of the Congress clearly expressed" to give a statute extraterritorial effect, *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (quoting *Arabian Am. Oil*, 499 U.S. at 248), courts look to the text of the statute to discern whether there is a "clear indication of extraterritoriality," *id.* at 265; *see also WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2136 (2018). If the statute lacks such a "clear statement" of extraterritorial effect, the statute does not apply abroad. *Morrison*, 561 U.S. at 265.

However, a claim may still survive if it properly states a "domestic application" of the statute. *See id.* at 266. As it is "a rare case . . . that lacks *all* contact with the territory of the United States," *id.* (emphasis in original), many cases present a mixed bag of both domestic and foreign components. Accordingly, at the second step, courts must evaluate whether the domestic activity pleaded is the "focus of congressional concern." *Id.* In other words, because the presumption against extraterritoriality would be a "craven watchdog indeed" if it "retreated to its kennel whenever *some* domestic activity is involved," *id.* (emphasis in original),

13

courts must evaluate whether the domestic activity involved implicates the "focus" of the statute.

Therefore, we first assess the text of each of the three provisions implicated by this suit – the two substantive regulations, Sections 6(c)(1) and 9(a)(2), and the private right of action, Section 22 – to determine if any of them contains a "clear indication of extraterritoriality." *Morrison*, 561 U.S.A at 265; *see RJR Nabisco*, 136 S. Ct. at 2106–2111 (evaluating extraterritorial application of RICO's private right of action provision separately from substantive RICO provisions).

## A. Affirmative Intention to Apply Extraterritorially

As to whether Congress intended Section 22 to apply to conduct abroad, circuit precedent provides the answer. In *Loginovskaya v. Batratchenko*, we held that since Section 22 of the CEA "is silent as to extraterritorial reach," suits funneled through this private right of action "must be based on transactions occurring in the territory of the United States." 764 F.3d 266, 271, 272 (2d Cir. 2014).[6]

The same is also true of Sections 6(c)(1) and 9(a)(2). Specifically, Section 6(c)(1) proscribes "us[ing] or employ[ing], . . . in connection with any swap, or a

---

[6] While the Dodd-Frank Wall Street Reform and Consumer Protection Act amended the CEA to apply extraterritorially to certain swap-related activities, *see* 7 U.S.C.A. § 2(i), that amendment does not affect our analysis here for reasons separately explained below.

contract of sale of any commodity, . . . any manipulative or deceptive device."  7

U.S.C. § 9.  Thus, on its face, Section 6(c)(1) – like Section 22 – "lacks . . . a clear

statement of extraterritorial effect."  *Morrison*, 561 U.S. at 265.  Section 9(a)(2),

which prohibits "manipulat[ing] or attempt[ing] to manipulate the price of any

commodity in interstate commerce," 7 U.S.C. § 13, likewise contains no

affirmative, textual indication that it applies to conduct abroad.  By contrast, as the

Supreme Court noted in *Morrison*, other provisions in the securities laws, such as

15 U.S.C. § 78dd(a), "contain[] what [Sections 6(c)(1) and 9(a)(2)] lack[ ]:  a clear

statement of extraterritorial effect."  *Morrison*, 561 U.S. at 265.

Plaintiffs make a last-ditch effort to establish  that extraterritorial application

of the CEA is proper by resorting to a separate provision – Section 2(i).  Enacted

pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act,

Pub. L. No. 111-203, 124 Stat. 1376 (2010), Section 2(i) of the CEA states:

> The provisions of this Act relating to swaps . . . shall not apply to
> activities outside the United States unless those activities – (1) have a
> direct and significant connection with activities in, or effect on,
> commerce of the United States; or (2) contravene such rules or
> regulations as the Commission may prescribe . . . to prevent the
> evasion of any provision of this Act.

7 U.S.C.A. § 2(i).  Unlike Sections 6(c)(1) and 9(a)(2), Section 2(i) contains, on its

face, a "clear statement," *Morrison*, 561 U.S. at 265, of extraterritorial application.

15

If there were any lingering doubts about whether Sections 6(c)(1) and 9(a)(2) independently apply extraterritorially, Section 2(i) forecloses those doubts, because it shows that Congress "knows how to give a statute explicit extraterritorial effect . . . and how to limit that effect to particular applications" within the CEA. *Morrison*, 561 U.S. at 265 n.8. Therefore, the existence of an enumerated extraterritorial command in Section 2(i) reinforces our conclusion that the lack of any analogous directive in either Section 6(c)(1) or Section 9(a)(2) bars their extraterritorial application here.

As for Plaintiffs' contention that Section 2(i) applies extraterritorially here because there is a "direct and significant connection" to the United States, even a charitable reading of the docket reveals that Plaintiffs neglected to raise this argument until *after* the district court rendered its final judgment. Indeed, Plaintiffs did not even mention this argument in their opposition to Defendants' motion to dismiss. *See* Doc. No. 148 ("CFTC Amicus Br.") at 4 ("The Commission takes no position on whether or how Section 2(i) may apply here. That was not litigated below . . . ."). We have found an argument to be waived for purposes of appellate review where a litigant "failed to make any such argument in opposition to the defendants' motion." *Askins v. Doe No. 1*, 727 F.3d 248, 252 (2d Cir. 2013).

Hence, Plaintiffs have waived the argument that Section 2(i) sustains claims encompassing "swap-related" Brent transactions. *See Morrison*, 561 U.S. at 254 (reiterating that a question regarding the extraterritorial reach of a federal statute presents a "merits question," not a question of subject-matter jurisdiction).[7]

## B. Domestic Application of Sections 22, 6(c)(1), and 9(a)(2)

Plaintiffs urge that even if the relevant provisions of the CEA do not apply extraterritorially, the district court erred because the SAC alleges a proper "domestic application of the statute." *RJR Nabisco*, 136 S. Ct. at 2101 ("If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute.").

Whether Plaintiffs' claims constitute a satisfactory domestic application of the CEA requires us to discern the "focus of congressional concern" in enacting the statute. *Morrison*, 561 U.S. at 266. To divine the CEA's "focus," we consider the "conduct" that the statute "seeks to regulate," as well as "the parties and

---

[7] Even if we considered the applicability of Section 2(i), our conclusion would not change. The most recent acts of the alleged manipulation described by Plaintiffs occurred in September 2012, before Section 2(i) became effective, and the provision is silent as to retroactive application. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("[C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.").

interests it seeks to protect or vindicate." *WesternGeco*, 138 S. Ct. at 2137 (quoting *Morrison*, 561 U.S. at 267). Our inquiry is guided by the statute's text, *see Morrison*, 561 U.S. at 266–69, as well as how the "statutory provision at issue works in tandem with other provisions," *WesternGeco*, 138 S. Ct. at 2137.

Importantly, we must discern the "focus" of each provision individually, for even if Plaintiffs satisfactorily pleaded a domestic application for one of the conduct-regulating provisions – i.e., Sections 6(c)(1) and 9(a)(2) – they must also do the same for the CEA's private right of action provision, Section 22. *See Loginovskaya*, 764 F.3d at 272; *see also RJR Nabisco*, 136 S. Ct. at 2106 ("[W]e separately apply the presumption against extraterritoriality to RICO's [private] cause of action."). Because Plaintiffs' suit "must satisfy the threshold requirement of CEA § 22 before reaching the merits of [their] § [6(c)(1) and 9(a)(2)] fraud claim[s]," *Loginovskaya*, 764 F.3d at 272, we start by assessing whether Plaintiffs have pleaded a proper domestic application of Section 22.

### 1. Section 22

In *Loginovskaya*, we held that the focus of congressional concern in Section 22 is "clearly transactional," given its emphasis on "domestic conduct [and] domestic transactions." *Id*. Thus, in order for Plaintiffs to state a proper domestic

18

application of Section 22, the suit "must be based on transactions occurring in the territory of the United States." The "domestic transaction test" essentially "decides the territorial reach of [Section] 22."[8] *Id.*

To assess whether Plaintiffs pleaded permissibly domestic transactions under Section 22, typically we would apply a test first announced in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012). However, following the course we have taken in securities cases, *see Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014), we need not decide definitively whether Plaintiffs' transactions satisfy *Absolute Activist*, for (as discussed below) their claims are impermissibly extraterritorial even if the transactions are domestic. Thus, we assume without deciding that Plaintiffs' trades on NYMEX and ICE Futures Europe constituted "domestic transactions" under Section 22.

In *Parkcentral*, investors in equity swaps pegged to the price of Volkswagen stock sued under Section 10(b), alleging that defendants made misleading

_____

[8] In evaluating whether Plaintiffs' claims fit within the "focus" of Section 22, we must assess the "*conduct relevant* to the statute's focus." *WesternGeco*, 138 S. Ct. at 2137 (emphasis added) (quoting *RJR Nabisco*, 136 S. Ct. at 2101). Defendants do not dispute that the "relevant conduct" under Section 22 is the purchase and sale of Brent Futures. As such, for the purposes of our Section 22 analysis, we take those commodities transactions to be the relevant conduct.

19

statements that sought to hide their intentions to take over Volkswagen. 763 F.3d at 201–02. All of defendants' misconduct occurred in Germany, and Volkswagen stock only traded on European stock exchanges. *Id*. We assumed without deciding that the equity swaps at issue there were "domestic transactions" under Section 10(b), but nonetheless dismissed the claims because the facts in that case rendered the suit "predominately foreign." *Id*. at 216. The predicate to our conclusion in *Parkcentral* was the maxim that "a domestic transaction or listing is *necessary*" but "not alone sufficient" to state a claim under Section 10(b). *Id*. at 215–16 (emphasis in original). The question this case presents is whether *Parkcentral*'s rule carries over to the CEA. We hold that it does.

For starters, Section 22 creates no freestanding, substantive legal obligations; instead, it requires the "commission of a violation of this chapter." 7 U.S.C. § 25(a)(1); *see* Doc. No. 242 ("Chamber of Commerce *et al*. Amicus Br.") at 20. And as already discussed above, the conduct-regulating provisions of the CEA – particularly those at issue here – apply only to *domestic* conduct, and not to foreign conduct. *See supra* Section III.A. Put differently, while a domestic transaction is necessary to invoke Section 22, it is not *sufficient*, for a plaintiff must also allege a domestic violation of one of the CEA's substantive provisions. So *Parkcentral*'s

20

insight – that a domestic securities transaction is necessary but not sufficient to state a claim under Section 10(b), *see Parkcentral*, 763 F.3d at 214 – is required by the text and structure of Section 22.  To hold otherwise would be to divorce the private right afforded in Section 22 from the requirement of a domestic violation of a substantive provision of the CEA.  *See WesternGeco*, 138 S. Ct. at 2137 ("If the statutory provision at issue works in tandem with other provisions, it must be assessed in concert with those other provisions.  Otherwise, it would be impossible to accurately determine whether the application of the statute in the case is a 'domestic application.'" (quoting *RJR Nabisco*, 136 S. Ct. at 2017)); *see also* Chamber of Commerce *et al*. Amicus Br. at 20–21.  To state a proper claim under Section 22 in this case, Plaintiffs must allege not only a domestic transaction, but also domestic – not extraterritorial – *conduct* by Defendants that is violative of a substantive provision of the CEA, such as Section 6(c)(1) or Section 9(a)(2). *See WesternGeco*, 138 S. Ct. at 2137–38 (looking to "the type of infringement that occurred" in analyzing whether litigant stated a domestic application of the damages remedy provision of the Patent Act, and concluding that it did because "[t]he conduct in this case that is relevant to th[e] [statute's] focus clearly occurred in the United States").

Besides the structure of the CEA and the language of Section 22, the presumption against extraterritoriality also counsels in favor of extending *Parkcentral*'s holding to the instant case. Permitting a suit to go forward any time a domestic transaction is pleaded would turn the presumption against extraterritoriality into a "craven watchdog," *Morrison*, 561 U.S. at 266, and would fly in the face of the Supreme Court's clear guidance that the presumption against extraterritoriality cannot evaporate any time "*some* domestic activity is involved in the case," *id*. (emphasis in original). As *Morrison* notes, the mere fact that a domestic transaction – i.e., "some" domestic activity – is involved is insufficient to rebut the presumption against extraterritoriality in light of the fact that "[f]oreign conduct is generally the domain of foreign law," *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455 (2007). *Parkcentral* recognized this very concern, reasoning that "a rule making [Section 10(b)] applicable whenever the plaintiff's suit is predicated on a domestic transaction," regardless of the "foreignness of the facts," would trample on *Morrison* by requiring us to apply the statute to "wholly foreign activity," *Parkcentral*, 763 F.3d at 215. In addition, potential "unintended clashes between our laws and those of other nations . . . could result in international discord," *Arabian Am. Oil*, 499 U.S. at 248, if we "adopt an interpretation of U.S.

22

law that carries foreign policy consequences not clearly intended by the political branches," *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013) (quoting *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147 (1957)). Given that courts "have looked to the securities laws" when asked "to interpret similar provisions of the CEA," *Loginovskaya*, 764 F.3d at 272, we do not hesitate in applying *Parkcentral*'s gloss on domestic transactions under Section 10(b) to domestic transactions under Section 22 of the CEA. Therefore, while a domestic transaction as defined by *Absolute Activist* is "necessary" to invoke the private remedy afforded by Section 22, it is not "sufficient."

In order to close the gap between "necessary" and "sufficient," Plaintiffs' claims must not be "so predominately foreign as to be impermissibly extraterritorial." *Parkcentral*, 763 F.3d at 216. Here, the facts are remarkably similar to those in *Parkcentral*, and therefore leave little doubt that Plaintiffs' claims are "predominately foreign."

In both cases, plaintiffs traded derivatives – in *Parkcentral*, equity swaps, and here, futures contracts – which, by their nature, are pegged to the value of another asset. Both underlying assets were foreign: *Parkcentral* involved the price of Volkswagen stock traded on European stock exchanges, and here Plaintiffs'

23

transactions were based on the Dated Brent Assessment, which itself reflects, in part, the value of Brent crude physically traded in Northern Europe. The alleged misconduct in both instances was also entirely foreign. Indeed, *Parkcentral*'s facts are perhaps *less* predominantly foreign than those alleged here, since the misleading statements at issue in *Parkcentral* were "accessible in the United States and were repeated here by the defendants," *Parkcentral*, 763 F.3d at 201, whereas Plaintiffs in this case make no claim that any manipulative oil trading occurred in the United States. Moreover, in *Parkcentral*, the equity swaps traded in the United States were "directly tied to the price of Volkswagen's shares on foreign exchanges." Here, Plaintiffs rely on an even more attenuated "ripple effects" theory whereby (1) the alleged manipulative trading activity taking place in the North Sea (2) affected Brent crude prices – a foreign commodity – which (3) affected a foreign benchmark, the Dated Brent Assessment, which (4) was then disseminated by a foreign price-reporting agency, which (5) was then allegedly used (in part) to price futures contracts traded on exchanges around the world. Nearly every link in Plaintiffs' chain of wrongdoing is entirely foreign – in contrast to *Parkcentral*, where the alleged wrongdoing occurred on American shores at the second causal step, not the fifth. And yet even in *Parkcentral*, we deemed the

24

conduct to be "so predominantly foreign" as to render the claims impermissibly extraterritorial. *Parkcentral*, 763 F.3d at 216. The same conclusion is warranted here. Therefore, we conclude that Plaintiffs have failed to plead a proper domestic application of Section 22 of the CEA.

## 2. Sections 6(c)(1) and 9(a)(2)

Although "[Plaintiffs'] suit must satisfy the threshold requirement of CEA Section 22 before reaching the merits of [their] Section [6(c)(1) and 9(a)(2)] fraud claim," *Loginovskaya*, 764 F.3d at 272, Plaintiffs have, in any event, also failed to plead a proper domestic application of either Section 6(c)(1) or 9(a)(2).

Section 6(c)(1), in relevant part, makes it "unlawful for any person, directly or indirectly, to use or employ . . . in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance." 7 U.S.C. § 9(a)(1). Plaintiffs urge this Court to ignore the plain text of the statute and suggest that the focus of this Section is the locus of the transaction. Plaintiffs point to *Morrison*, where the Supreme Court held that Section 10(b), which contains similar language, focused "not upon the place where the deception originated, but upon purchases and sales of securities in the United

States." *Morrison*, 561 U.S. at 266. But the language of Section 6(c)(1) crucially differs from Section 10(b), as the latter prohibits "us[ing] or employ[ing], in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered[,] . . . any manipulative or deceptive device," 15 U.S.C. § 78j, while Section 6(c)(1) contains no mention of a "national securities exchange." Thus, there is no great significance in this case to *Morrison*'s determination that Section 10(b) focused specifically on "deceptive conduct 'in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered.'" *Morrison*, 561 U.S. at 266 (quoting 15 U.S.C. § 78j). There is nothing in Section 6(c)(1)'s text suggesting that it is focused on "purchases and sales of securities in the United States," *Morrison*, 561 U.S. at 266, and other available evidence in the CEA, such as that statute's statement of purpose, suggests that the focus is on rooting out manipulation and ensuring market integrity – not on the geographical coordinates of the transaction. *See* 7 U.S.C. § 5 ("[I]t is further the purpose of this chapter to deter and prevent price manipulation or any other disruptions to market integrity . . . to ensure the financial integrity of all transactions subject to this chapter."); *see also* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 33

26

(2012) (noting that a statute's enumerated statement of purpose is relevant when interpreting a text). Therefore, we discern that Section 6(c)(1) centers on manipulation in commodities markets. All of the conduct relevant to *that* focus occurred abroad – Defendants are alleged to have manipulated the physical Brent crude market near Europe's North Sea by engaging in fraud there. And if "the relevant conduct occurred in another country, 'then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.'" *WesternGeco*, 138 S. Ct. at 2137 (quoting *RJR Nabisco*, 136 S. Ct. at 2101). As a result, Plaintiffs have failed to plead a proper domestic application of Section 6(c)(1).

Plaintiffs have also failed to plead a domestic application of Section 9(a)(2). That Section proscribes "manipulat[ing] or attempt[ing] to manipulate the price of any commodity in interstate commerce." 7 U.S.C. § 13(a)(2). The focus of Section 9(a)(2) is preventing manipulation of the price of any commodity. And all of the relevant conduct here relating to *that* focus occurred abroad – Plaintiffs contend that Defendants sought to manipulate the price of Brent crude, and did so by fraudulently transacting in the physical market in Europe. Plaintiffs make no allegation of manipulative conduct or statements made in the United States. To

the contrary, they expressly rely on a "ripple effect" or chain of events that resembles a falling row of dominoes commencing in the North Sea. Accordingly, Plaintiffs fail to plead a proper domestic application of Section 9(a)(2) as well.[9]

## IV. CONCLUSION

We do not lightly dismiss Plaintiffs' troubling allegations against Defendants, which include serious claims premised on manipulation, fraud, and deceit. Nonetheless, "the sole function of the courts is to enforce [the CEA] according to its terms," not to reinvent it. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). The presumption against extraterritoriality reflects the recognition that "[a]ll legislation is prima facie territorial." *Am. Banana Co. v. United Fruit Co.*, 213 U.S. 347, 357 (1909) (Holmes, J.). That presumption has not been displaced here, and Plaintiffs have not pleaded a domestic application of the CEA by mere dint of the fact that – after a winding chain of foreign, intervening events – they purchased Brent Futures on exchanges. Were we to hold otherwise, the CEA would indeed "rule the world." *Microsoft*, 550 U.S. at 454.

Accordingly, the judgment of the district court is **AFFIRMED**.

---

[9] Because Plaintiffs have not pleaded a domestic application of either Section 6(c)(1) or 9(a)(2), we need not decide whether *Parkcentral* applies to those sections.