# United States Court of Appeals
# for the Second Circuit

August Term 2021
Argued: May 24, 2022
Decided: October 18, 2022

Nos. 20-3626(L), 20-3775(XAP)

JEFFREY LAYDON,
on behalf of himself and all others similarly situated,

*Plaintiff-Appellant-Cross-Appellee*,

v.

COÖPERATIEVE RABOBANK U.A., BARCLAYS BANK PLC,
SOCIÉTÉ GÉNÉRALE S.A.,

*Defendants-Appellees-Cross-Appellants*,

THE ROYAL BANK OF SCOTLAND GROUP PLC, UBS AG, LLOYDS
BANKING GROUP PLC, UBS SECURITIES JAPAN CO., LTD., THE ROYAL
BANK OF SCOTLAND PLC, RBS SECURITIES JAPAN LIMITED,

*Defendants-Appellees.**

On Appeal from the United States District Court
for the Southern District of New York

---

* The Clerk of Court is respectfully directed to amend the caption accordingly.

Before:    POOLER, PARK, and LEE, *Circuit Judges*.

Plaintiff Jeffrey Laydon brought this putative class action against more than twenty banks and brokers, alleging a conspiracy to manipulate two benchmark rates known as Yen-LIBOR and Euroyen TIBOR. He claimed that he was injured after purchasing and trading a Euroyen TIBOR futures contract on a U.S.-based commodity exchange because the value of that contract was based on a distorted, artificial Euroyen TIBOR. Plaintiff brought claims under the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, and the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, and sought leave to assert claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, 1964(c). The district court (Daniels, *J.*) dismissed the CEA and antitrust claims and denied leave to add the RICO claims. Plaintiff appeals, arguing that the district court erred by holding that the CEA claims were impermissibly extraterritorial, that he lacked antitrust standing to assert a Sherman Act claim, and that he failed to allege proximate causation for his proposed RICO claims.

We affirm. The alleged conduct—*i.e.*, that the bank defendants presented fraudulent submissions to an organization based in London that set a benchmark rate related to a foreign currency—occurred almost entirely overseas. Indeed, Plaintiff fails to allege any significant acts that took place in the United States. Plaintiff's CEA claims are based predominantly on foreign conduct and are thus impermissibly extraterritorial. *See Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 106 (2d Cir. 2019). The district court also correctly concluded that Plaintiff lacked antitrust standing because he would not be an efficient enforcer of the antitrust laws. *See Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 115–20 (2d Cir. 2021). Lastly, we agree with the district court that Plaintiff failed to allege proximate causation for his RICO claims. The judgment of the district court is thus **AFFIRMED**.

ERIC F. CITRON, Goldstein & Russell, P.C., Bethesda, MD (Vincent Briganti, Margaret MacLean, Lowey Dannenberg, P.C., White Plains, NY, *on the brief*), *for Plaintiff-Appellant-Cross-Appellee Jeffrey Laydon.*

THOMAS G. HUNGAR, Gibson, Dunn & Crutcher LLP, Washington, DC (Russell B. Balikian, Gibson, Dunn & Crutcher LLP, Washington, DC; Mark A. Kirsch, Eric J. Stock, Jefferson E. Bell, Gibson, Dunn & Crutcher LLP, New York, NY, *on the brief*), *for Defendants-Appellees UBS AG and UBS Securities Japan Co., Ltd.*

MARC J. GOTTRIDGE, Hogan Lovells US LLP, New York, NY (Lisa J. Fried, Benjamin A. Fleming, Hogan Lovells US LLP, New York, NY, *on the brief*), *for Defendant-Appellee Lloyds Banking Group plc.*

NICOLE A. SAHARSKY, Mayer Brown LLP, New York, NY (Steven Wolowitz, Andrew J. Calica, Mayer Brown LLP, New York, NY, *on the brief*), *for Defendant-Appellee-Cross-Appellant Société Générale S.A.*

David R. Gelfand, Tawfiq S. Rangwala, Milbank LLP, New York, NY; Mark D. Villaverde, Milbank LLP, Los Angeles, CA, *for Defendant-Appellee-Cross-Appellant Coöperatieve Rabobank U.A.*

David S. Lesser, King & Spalding LLP, New York, NY; Robert G. Houck, Clifford Chance US LLP, New York, NY, *for Defendants-Appellees The Royal Bank of Scotland plc, The Royal Bank of Scotland Group plc, and RBS Securities Japan Ltd.*

3

PARK, *Circuit Judge*:

Plaintiff Jeffrey Laydon brought this putative class action against more than twenty banks and brokers, alleging a conspiracy to manipulate two benchmark rates known as Yen-LIBOR and Euroyen TIBOR. He claimed that he was injured after purchasing and trading a Euroyen TIBOR futures contract on a U.S.-based commodity exchange because the value of that contract was based on a distorted, artificial Euroyen TIBOR. Plaintiff brought claims under the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, and the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, and sought leave to assert claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, 1964(c). The district court (Daniels, *J.*) dismissed the CEA and antitrust claims and denied leave to add the RICO claims. Plaintiff appeals, arguing that the district court erred by holding that the CEA claims were impermissibly extraterritorial, that he lacked antitrust standing to assert a Sherman Act claim, and that he failed to allege proximate causation for his proposed RICO claims.

We affirm. The alleged conduct—*i.e.*, that the bank defendants presented fraudulent submissions to an organization based in London that set a benchmark rate related to a foreign currency—occurred almost entirely overseas. Indeed, Plaintiff fails to allege any significant acts that took place in the United States. Plaintiff's CEA claims are based predominantly on foreign conduct and are thus impermissibly extraterritorial. *See Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 106 (2d Cir. 2019). The district court

4

also correctly concluded that Plaintiff lacked antitrust standing because he would not be an efficient enforcer of the antitrust laws. *See Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 115–20 (2d Cir. 2021). Lastly, we agree with the district court that Plaintiff failed to allege proximate causation for his RICO claims. The judgment of the district court is thus affirmed.

## I. BACKGROUND

A. Factual Background

1. *Yen-LIBOR and Euroyen TIBOR*

Plaintiff alleges the manipulation of two benchmark rates known as Yen-LIBOR and Euroyen TIBOR, which reflected the interest rates at which banks can lend Japanese Yen outside of Japan.[1] There were two key differences between Yen-LIBOR and Euroyen TIBOR. First, different entities set the rates. During the relevant period, the Japanese Bankers Association ("JBA") set Euroyen TIBOR by accepting submissions from a panel of banks headquartered primarily in Japan. Each bank submitted to the JBA the interest rate at which it could borrow offshore Yen. The JBA then calculated Euroyen TIBOR for various maturities by discarding the two highest and two lowest submissions and averaging the remaining ones. Yen-LIBOR, on the other hand, was a London-based benchmark set

---

[1] The names are short for "Yen London Interbank Offered Rate" and "Euroyen Tokyo Interbank Offered Rate," respectively. The Euroyen, also known as offshore yen, refers to deposits denominated in Japanese Yen held outside of Japan. Yen-LIBOR and Euroyen TIBOR are based on "the interest rates at which banks offer to lend unsecured funds denominated in Japanese Yen to other banks in the offshore wholesale money market (or interbank market)." Third Am. Compl. ¶ 122.

5

by the British Bankers' Association ("BBA"). Each bank sitting on a panel of London-based banks submitted to the BBA the rate at which it could borrow Yen outside of Japan. The BBA calculated Yen-LIBOR by discarding the highest and lowest 25% of submissions and determining the average of the remaining 50%. The second major difference between the rates was that they were set at different times. "Euroyen TIBOR [was] calculated on each business day as of 11:00 a.m. Tokyo time," while "Yen-LIBOR [was] calculated each business day as of 11:00 a.m. London time." Third Am. Compl. ¶¶ 126, 130.

2. *The Alleged Conduct*

Plaintiff Laydon is a U.S. resident who traded three-month Euroyen TIBOR futures contracts between January 1, 2006 and June 30, 2011 (the "Class Period"). This type of contract is an "agreement to buy or sell a Euroyen time deposit having a principal value of 100,000,000 Japanese Yen with a three-month maturity commencing on a specific future date." Third Am. Compl. ¶ 134.[2] Plaintiff placed these trades on the Chicago Mercantile Exchange ("CME"), a U.S.-based futures exchange. Specifically, he "initiated a short position by selling five . . . Euroyen TIBOR futures contracts on July 13, 2006 at a price of $99.315 per contract" and then "liquidated that position by purchasing five long . . . futures contracts on August 3, 2006 at a price of $99.490 per contract for loss of $2,150.35." *Id.* ¶ 911. Defendants-Appellees served as panel banks for the BBA in setting

_____

[2] Unlike an "ordinary bank deposit" that is "payable on demand," a time deposit cannot be withdrawn from the bank before a set date. *See* 10 Am. Jur. 2d Banks and Fin. Insts. § 641.

Yen-LIBOR during the relevant period.[3]   Plaintiff also sued several derivatives brokers who allegedly helped Defendants manipulate Yen-LIBOR and Euroyen TIBOR.[4]

Plaintiff maintains that Defendants conspired to manipulate Yen-LIBOR and Euroyen TIBOR by giving false Yen-LIBOR submissions to the BBA, which affected the price of Plaintiff's three-month Euroyen TIBOR futures.   Although Defendants did not serve as panel banks for the JBA in setting Euroyen TIBOR, Plaintiff alleges that their purported manipulation of Yen-LIBOR—which is set earlier in the day—affected Euroyen TIBOR.   *See* Third Am. Compl. ¶¶ 844, 845 (alleging that "[c]hanges in Yen-LIBOR will be immediately reflected in Euroyen TIBOR rates . . . once Euroyen TIBOR opens" and that "the reporting of false and inaccurate Yen-LIBOR rates . . . cause[d] artificial Euroyen TIBOR rates and artificial Euroyen TIBOR futures prices").

He further asserts that the "driving force[s] behind Defendants' manipulation" were conflicts of interest.   *Id.* ¶ 167.   Namely,

---

[3]   These include UBS AG and UBS Securities Japan Co., Ltd. ("UBS"); the Royal Bank of Scotland Group plc, The Royal Bank of Scotland plc, and RBS Securities Japan Limited ("RBS"); Lloyds Banking Group plc ("Lloyds"); Barclays Bank PLC ("Barclays"); Société Générale S.A. ("SocGen"); and Coöperatieve Rabobank U.A. ("Rabobank") (collectively, "Defendants").

[4]   The broker defendants who initially joined this appeal were ICAP plc and ICAP Europe Limited (collectively, "ICAP") and Tullett Prebon plc. We granted Plaintiff's motion to sever and stay the appeal with respect to ICAP and Tullett Prebon and remanded to allow the district court to consider a proposed class-action settlement between Plaintiff and these parties.

Plaintiff claims that Defendants held their own "Euroyen-based derivatives positions" and that their traders' "compensation was based in part on the profit and loss calculation" of Defendants' trading books. *Id.* And "even very small movements in Yen-LIBOR . . . would have a significant positive impact on the profitability of" trading positions, so Defendants' traders had incentives to manipulate Yen-LIBOR. *Id.*

To support these allegations, Plaintiff relies on information revealed in various domestic and foreign enforcement proceedings. He points to Defendants' admissions concerning actions taken by their employees at overseas trading desks. These allegations describe Defendants' foreign-based employees submitting false rates to the BBA, as well as traders asking other employees responsible for sending submissions to the BBA to move the benchmark rate in a direction that would benefit the trader's trading position.[5] As for domestic conduct, Plaintiff primarily relies on a handful of communications sent from Defendants' foreign-based employees

---

[5] For example, Plaintiff alleges that RBS Yen traders "attempted to manipulate Yen-LIBOR by making hundreds of manipulative requests of RBS' Primary Submitter, Paul White, and London-based traders." Third Am. Compl. ¶ 267 ("RBS' derivatives traders' requests for artificial Yen-LIBOR submissions were common and made openly on the trading floors in Asia and London."). Similarly, Plaintiff asserts that UBS began tendering "false Yen-LIBOR and Euroyen TIBOR" submissions as early as 2006. *Id.* ¶ 241. Plaintiff focuses on the actions of UBS Yen Traders Tom Hayes and Roger Darin, who operated from UBS desks in Tokyo, Singapore, and Zurich, and were prosecuted in the United States and the United Kingdom for manipulating Yen-LIBOR.

through or to servers located in the United States.[6] Plaintiff does not allege that Defendants' employees sent artificial submissions to the BBA from within the United States.

On behalf of a putative class, Plaintiff sought an unspecified amount in regular and treble damages, as well as an injunction prohibiting Defendants from continuing their alleged unlawful conduct.

B.    Procedural Background

Plaintiff filed this action in 2012. On April 15, 2013, before the district court resolved any substantive motions, Plaintiff filed the Second Amended Complaint, alleging claims under the CEA, 7 U.S.C. § 1 *et seq.*, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*[7]

Over nearly a decade of litigation, the district court issued several orders dismissing various claims and defendants. First, on March 28, 2014, the court granted Defendants' motion to dismiss

---

[6] Plaintiff cites a criminal complaint brought by U.S. prosecutors against UBS Yen Trader, Tom Alexander William Hayes, which alleges that Hayes "caused confirmations . . . to be transmitted from outside the United States to a counterparty based in Purchase, New York, for transactions involving interest rate derivative products tied to a benchmark interest rate which [Hayes] was secretly manipulating." Joint App'x at 2036. Plaintiff also relies on the testimony of a Rabobank employee, Anthony Allen, from his trial for wire fraud stemming from manipulation of Yen-LIBOR, reflecting that Allen knew that some of the counterparties to Rabobank's transactions were in the United States. *See* Third Am. Compl. ¶¶ 92–93.

[7] Plaintiff also brought an unjust-enrichment claim and a CEA vicarious-liability claim, but he does not appeal the dismissal of those claims.

9

Plaintiff's antitrust claims, finding that Plaintiff lacked antitrust standing in part because he would not be an "efficient enforcer" of the alleged antitrust violation. The court allowed the remaining CEA claims to proceed.

Plaintiff next sought leave to file the Third Amended Complaint to add RICO claims and additional defendants. On March 31, 2015, the district court allowed Plaintiff to file the new pleadings but denied leave to add the RICO claims, finding that Plaintiff did "not show a sufficiently direct connection between the alleged misconduct and the injury to support a RICO claim." Special App'x at 58. That same day, the court also dismissed several defendants for lack of personal jurisdiction, rejecting Plaintiff's conspiracy theory of personal jurisdiction.

Two years later, on March 10, 2017, the district court dismissed several new defendants named in the Third Amended Complaint— including the broker Defendants ICAP and Tullett Prebon plc—for lack of personal jurisdiction, finding that their alleged conduct did not create a substantial connection with the United States and once again rejecting Plaintiff's "'conspiracy theory' of jurisdiction." Special App'x at 73–79. Finally, on August 27, 2020, the court dismissed the surviving CEA claims against the remaining defendants, finding the claims impermissibly extraterritorial because "Defendants' alleged wrongful conduct . . . is almost entirely foreign." *Id.* at 86. Plaintiff filed a timely notice of appeal.[8]

---

[8] Defendants Barclays, SocGen, and Rabobank filed a cross-appeal, challenging the district court's November 10, 2014 order denying them leave to file a motion to dismiss based on lack of personal jurisdiction. We severed the main appeal and the cross appeal as to Barclays and ordered a

## II. DISCUSSION

Plaintiff argues that the district court erred by dismissing his CEA claims as impermissibly extraterritorial. He also challenges the district court's decisions to dismiss his antitrust claims for lack of standing and to reject his RICO claims for lack of proximate causation.[9] "We review de novo the dismissal of a complaint for failure to state a claim upon which relief can be granted." *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 65 (2d Cir. 2018) (citation omitted). "The denial of leave to amend is similarly reviewed *de novo* because the denial was based on an interpretation of law, such as futility." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 769 (2d Cir. 2016) (cleaned up).

We agree with the district court that Plaintiff failed to state a claim under the CEA because the alleged conduct occurred predominantly outside the United States. We also agree that

limited remand for the district court to consider the approval of a proposed class action settlement between Plaintiff and Barclays. As to SocGen and Rabobank, we need not reach the issues in their cross-appeal—which concern whether the district court properly found that they forfeited or waived their personal jurisdiction arguments—because we affirm the district court's dismissal orders on the merits.

[9] Plaintiff also argues that the district court erred by dismissing several defendants for lack of personal jurisdiction. We do not reach this issue because our decision on the merits provides an alternative ground for affirmance. *See Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012); 4 C. Wright & A. Miller, Fed. Prac. and Proc. § 1067.6 (4th ed. 2022) ("[A] court simply may avoid the issue [of personal jurisdiction] by resolving the suit on the merits when they clearly must be decided in favor of the party challenging jurisdiction, thereby obviating any need to decide the question.").

Plaintiff lacks antitrust standing and failed to allege proximate causation for his RICO claims.

A.   Commodity Exchange Act Claims

   1.   *Legal Principles*

The CEA prohibits "manipulat[ing] or attempt[ing] to manipulate the price of any commodity in interstate commerce." 7 U.S.C. § 13(a)(2).   Section 22 of the CEA provides a private right of action, permitting a party to sue "[a]ny person . . . who violates this chapter" and hold that person liable "for actual damages resulting from one or more of the transactions" listed in the statute.   *Id.* § 25(a)(1).

"We interpret the CEA in light of the presumption against extraterritoriality, a canon of statutory interpretation that is a 'basic premise of our legal system.'"   *Prime*, 937 F.3d at 102 (quoting *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016)).   "This canon helps avoid the international discord that can result when U.S. law is applied to conduct in foreign countries" and "reflects the commonsense notion that Congress generally legislates with domestic concerns in mind."   *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 95 (2d Cir. 2019) (cleaned up).

We decide questions of extraterritoriality using a two-step framework.   First, we "ask[] whether the presumption against extraterritoriality has been rebutted" by "text [that] provides a clear indication of an extraterritorial application."   *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2136 (2018) (cleaned up).   "Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application."

12

*RJR Nabisco, Inc.*, 579 U.S. at 335; *see also Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) ("When a statute gives no clear indication of an extraterritorial application, it has none."). Second, if we conclude that the presumption against exterritoriality has not been rebutted, we decide "whether the case involves a domestic application of the statute." *RJR Nabisco, Inc.*, 579 U.S. at 337. To do so, we determine whether "the conduct relevant to the statute's focus occurred in the United States." *Id.* "[I]f the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.*

Section 22 of the CEA lacks any "affirmative intention by Congress to give [it] extraterritorial effect." *Loginovskaya v. Batratchenko*, 764 F.3d 266, 272 (2d Cir. 2014) (cleaned up). A claim relying on Section 22 must thus involve a domestic application of the statute. And the focus of the statute is transactional, *see id.* at 272, so "suits funneled through [the CEA's] private right of action must be based on transactions occurring in the territory of the United States," *Prime*, 937 F.3d at 103 (cleaned up).

Simply pleading a domestic transaction, however, is not enough. Section 22 is a general provision affording a cause of action to private litigants. Instead of prohibiting certain, specified conduct, it applies when a defendant commits "a violation of this chapter." 7 U.S.C. § 25(a)(1). A private plaintiff pleading a CEA claim under Section 22 must thus invoke a substantive provision of the CEA. *See Prime*, 937 F.3d at 105. And allowing a plaintiff to state a domestic application of Section 22 based merely on a domestic transaction "would . . . divorce the private right afforded in Section 22 from the

13

requirement of a domestic violation of a substantive provision of the CEA." *Id.* A plaintiff must thus plead not only a domestic transaction, but also sufficiently domestic conduct by the defendant. In other words, "Plaintiffs' claims must not be 'so predominantly foreign as to be impermissibly extraterritorial.'" *Id.* (quoting *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014)).

2. *Analysis*

Plaintiff's CEA claims are impermissibly extraterritorial because the conduct he alleges is "predominantly foreign." *Prime*, 937 F.3d at 106. First, Plaintiff traded a derivative that is tied to the value of a foreign asset. The complaint alleges that he was injured after purchasing and trading a Euroyen TIBOR futures contract, which is "an agreement to buy or sell a Euroyen time deposit having a principal value of 100,000,000 Japanese Yen with a three-month maturity commencing on a specific future date." Third Am. Compl. ¶ 134. As alleged, the value of this asset is, in part, determined by Yen-LIBOR and Euroyen TIBOR because these rates are meant to capture the prevalent interest rates at which banks lend such time deposits. So the value of this asset is based on rates set by foreign entities (*i.e.*, JBA and BBA) in foreign countries (*i.e.*, Japan and the United Kingdom).

Second, the alleged manipulative conduct occurred almost entirely abroad. Plaintiff's conspiracy allegations describe conduct and communications that occurred overseas on foreign trade desks.[10]

---

[10] *See, e.g.*, Third Am. Compl. ¶¶ 231–33 (Rabobank's employees, Anthony Allen and Tetsuya Motomura, made requests to contribute false submissions from "Rabobank's money market desk in London" and

14

Indeed, Plaintiff focuses on the actions of employees who worked in foreign offices. *See* Joint App'x at 2040, 2739.

Plaintiff's arguments to the contrary are meritless. His main contention is that he purchased a Euroyen TIBOR futures contract on the CME, a U.S.-based exchange. He argues that his "claims must be domestic because they involve both core domestic transactions (*i.e.*, transactions on a domestic exchange) *and* manipulation of a domestic commodity market." Appellant's Br. at 36 (emphasis added). Plaintiff also points to several instances of communications that were made from or went through the United States. For example, Plaintiff alleges that UBS trader Tom Hayes sent an email in furtherance of the conspiracy while on a brief, two-day trip in Las Vegas. These arguments fail for several reasons.

First, the subjects of the alleged manipulation, Yen-LIBOR and Euroyen TIBOR, are not commodities traded on a domestic exchange. The CEA defines the term "commodity" to include "all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). It would not make sense to say that the purchaser of a benchmark-based futures

Rabobank's trading desk in Tokyo, respectively); *id*. ¶ 296 (a Rabobank employee "made regular requests to Rabobank's London-based Yen setters" to transmit manipulated submissions); *id*. ¶ 269 ("a Euroyen-based derivatives trader employed by RBS Japan sent requests for favorable Yen-LIBOR submissions to a Yen derivatives trader in London"); *id*. ¶ 243 ("UBS managers in Tokyo and Zurich" were aware of false submission requests and "encouraged and allowed" such conduct to occur); *id*. (a UBS "Yen Desk Manager in Tokyo" engaged and encouraged the contribution of false submissions); *id*. ¶ 250 ("the manager of one of the [UBS] Yen derivatives trading desks in Tokyo exerted pressure on Yen-LIBOR submitters to take derivatives traders' positions into account when setting Yen-LIBOR").

contract receives a "delivery" of a price index like Euroyen TIBOR on the maturity date.[11]  Here, the asset to be delivered was a "time deposit having a principal value of 100,000,000 Japanese Yen with a three-month maturity commencing on a specific future date."  Third Am. Compl. ¶ 134.  Just as the purchaser of a copper or wheat future may receive those commodities upon maturity, the purchaser of a Euroyen TIBOR future may receive a 100,000,000 Japanese Yen time deposit in a foreign commercial bank.  Euroyen TIBOR affects the value of that time deposit, but that does not make Euroyen TIBOR itself a commodity.[12]

Also unlike commodities, benchmark rates do not themselves have any value.  And unlike a copper or wheat future, in which the purchaser receives "rights" or "interests" in the copper or wheat, 7 U.S.C. § 1a(9), the purchaser of a Euroyen TIBOR future does not receive "rights" or "interests" in Euroyen TIBOR itself, but in the product based on that rate—*i.e.*, the underlying 100,000,000 Japanese Yen deposit.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 612 (S.D.N.Y. 2013) (rejecting the argument that

---

[11] Upon maturity, most modern contracts are resolved through "cash settlement," which "gives the right to payments based on future change in the value of the [underlying asset] [the contract] references, rather than any right or obligation to delivery of the [asset] itself." *Parkcentral*, 763 F.3d at 206–07; *see Prime*, 937 F.3d at 100.  But regardless of the settlement method chosen by the transacting parties, futures contracts still deal with commodities that are usually deliverable by the seller to the purchaser.

[12] Just like the price of 500 bushels of wheat depends on the cash price of wheat at the date of maturity, the price of the 100,000,000 Japanese Yen deposit depends in part on Euroyen TIBOR.  But in the example, the wheat itself is the commodity rather than the price of wheat.

16

U.S. dollar LIBOR is a commodity underlying a Eurodollar future because "LIBOR is a price index," there is no "price of LIBOR independent from LIBOR itself," and because the underlying commodity of such a future is instead a time deposit in a foreign bank).[13]

Second, our precedent mandates dismissal of Plaintiff's CEA claims. In *Prime*, the plaintiffs traded futures on a U.S.-based exchange that were pegged to the Dated Brent Assessment, a rate that "reflect[ed], in part, the value of Brent crude physically traded in Northern Europe." 937 F.3d at 106. The plaintiffs alleged that the defendants manipulated the market for Brent crude and Brent futures by "systematically report[ing] . . . artificial transactions" to a foreign entity responsible for setting the Dated Brent Assessment rate. *Id.* at 100. We held that the plaintiffs' CEA claims were impermissibly extraterritorial because the derivatives at issue were "pegged to the value of" foreign assets and the alleged misconduct was foreign because the plaintiffs made "no claim that any manipulative oil trading occurred in the United States." *Id.* at 106.

---

[13] Plaintiff cites several CFTC settlement orders in which the Commodity Futures Trading Commission ("CFTC") referred to such benchmark rates as commodities. But these remarks are not formal acts of rulemaking or adjudication and are entitled to no deference, especially because the quoted statements are conclusory and fail to provide any supporting analysis. *See United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) ("The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, . . . and all those factors which give it power to persuade, if lacking power to control.") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (first alteration in original)).

17

Here, as in *Prime*, Plaintiff purchased a futures contract on a domestic market that incorporated an index tied to a foreign market, with that index being set by a foreign entity. According to Plaintiff, the crude index in *Prime* would also have been a commodity and, because the futures contract traded in the United States, any claims concerning that future would have been domestic. But we rejected this theory and held that the claims in *Prime* were impermissibly extraterritorial because the defendants in that case were "alleged to have manipulated the physical Brent crude market" in Europe "by engaging in fraud there." *Id.* at 107–08. So too here, Plaintiff alleges that Defendants conspired to manipulate Euroyen TIBOR (an index tied to a foreign market) by giving false Yen-LIBOR submissions to the BBA from foreign trading desks (conduct abroad). We thus affirm the district court's dismissal of Plaintiff's CEA claims.[14]

B.    Antitrust Claims

1.    *Legal Principles*

To state an antitrust claim, a plaintiff must first "show . . . antitrust standing." *Gelboim*, 823 F.3d at 770; *see generally Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*") (discussing the requirements of antitrust standing). Standing to bring an antitrust claim requires a plaintiff to show that (1) he has "suffered antitrust injury," and (2) he is an

---

[14] We are also unpersuaded by Plaintiff's argument that dismissal of his claims will "fatally undermine the ability of U.S. law and U.S. regulators to protect domestic markets and investors." Appellant's Br. at 38. The extraterritorial reach of Section 22, which concerns private rights of action, has nothing to do with government enforcement. *See* 7 U.S.C. § 25.

18

"efficient enforcer[] of the antitrust laws." *Gelboim*, 823 F.3d at 772. We look to four factors to determine whether a plaintiff is an efficient enforcer:

> (1) the directness or indirectness of the asserted injury, which requires evaluation of the chain of causation linking appellants' asserted injury and the [defendants'] alleged price-fixing; (2) the existence of more direct victims of the alleged conspiracy; (3) the extent to which appellants' damages claim is highly speculative; and (4) the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.

*Id.* at 778 (cleaned up) (citing *AGC*, 459 U.S. at 540–44).

2.	*Analysis*

We agree with the district court that Plaintiff failed to allege antitrust standing because he is not an efficient enforcer of the antitrust laws.

*Causation.* "For the purposes of antitrust standing, proximate cause is determined according to the so-called 'first-step rule,'" under which "injuries that happen at the first step following the harmful behavior are considered proximately caused by that behavior." *Schwab Short-Term Bond Mkt. Fund*, 22 F.4th at 116 (quoting *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 140 (2d Cir. 2021)). This inquiry "require[s] drawing a line between those whose injuries resulted from their direct transactions with [the defendants] and those whose injuries stemmed from their deals with third parties." *Id.*

19

Plaintiff here failed to allege that his injury was proximately caused by Defendants. He did not assert that he transacted directly with any Defendants or that Defendants controlled the Euroyen TIBOR futures contract that Plaintiff purchased. Instead, Plaintiff traded his futures contract with unknown third parties before the contract's maturity date. *See* Third Am. Compl. ¶ 57.

Further, Plaintiff's theory of liability depends on a series of causal steps that separate Defendants' conduct and his purported injury. Plaintiff asserts that (1) Defendants submitted fraudulent rates to the BBA; (2) the BBA then used these artificial submissions to set Yen-LIBOR; (3) the manipulated Yen-LIBOR affected Euroyen TIBOR during the Class Period; and (4) any distorted benchmark rate also affected the market's perception of the value of Plaintiff's Euroyen TIBOR futures contract. Plaintiff's injury thus occurred far from "the first step following" Defendants' "harmful behavior." *Schwab Short-Term Bond Mkt. Fund*, 22 F.4th at 116 (citation omitted).

*Existence of More Direct Victims.* Direct victims of an alleged antitrust conspiracy are situated to enforce the antitrust laws because their "self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *AGC*, 459 U.S. at 542. When only indirect victims bring suit, "it is difficult to understand why the[] direct victims of the conspiracy have not asserted any claim in their own right." *Id.* at 542 n.47; *see also Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 79 (2d Cir. 2013) ("If the 'superior' plaintiff has not sued, one may doubt the existence of any antitrust violation at all.") (internal quotation marks omitted) (quoting Phillip Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law*, § 3.01c, at 3–9 to 3–10 (4th ed. 2011)).

Plaintiff here is an indirect victim of the alleged conspiracy. Direct victims might include traders of interest-rate swaps—contracts in which a party exchanges one stream of fixed interest-rate payments for another flow of payments based on a variable, "floating" rate, such as Yen-LIBOR or Euroyen TIBOR. *See Sonterra Cap. Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 532–33 (2d Cir. 2020) (explaining interest rate swaps that incorporate Yen-LIBOR). Such a swap trader betting on the movement of benchmark rates like Yen-LIBOR and Euroyen TIBOR would be more directly harmed if Defendants had engaged in an antitrust conspiracy to manipulate Yen-LIBOR and Euroyen TIBOR.

*Speculative Damages.* We next consider whether the "asserted damages are speculative," because "a high degree of speculation in a damages calculation suggests that a given plaintiff is an inefficient engine of enforcement." *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 66–67 (2d Cir. 2019) (citations omitted). Damages are speculative "where countless other market variables could have intervened to affect . . . pricing" and the "theory of antitrust injury depends upon a complicated series of market interactions." *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13–14 (2d Cir. 1980). A district court should not be required to entertain "multiple layers of speculation" and "create[] . . . an alternative universe" to calculate damages. *IQ Dental Supply*, 924 F.3d at 67 (cleaned up).

Here, Plaintiff failed to plead any injury. He alleges that he entered and closed a short position in a Euroyen TIBOR futures contract in 2006. In other words, he bet that there would be "an increase in Euroyen TIBOR rates." Third Am. Compl. ¶ 138. Plaintiff alleges two acts occurring in August 2006 involving three-

21

month Euroyen TIBOR futures, both of which involved Defendants' alleged attempts to manipulate Yen-LIBOR *upwards*. But if true and Euroyen TIBOR rates did increase, Plaintiff would have benefited from Defendants' conduct. *See id.* (explaining that a trader who "go[es] short" would "profit from an increase in Euroyen TIBOR rates").

In any event, Plaintiff's theory of damages is also highly speculative. As explained above, his allegations rely on an attenuated chain of causation that would complicate if not render impossible any damages calculation. *See supra* at 20.

*Duplicative Recovery and Complex Damage Apportionment*. Finally, we consider "the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries." *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 66 (2d Cir. 1988). The focus of this factor is on "keeping the scope of complex antitrust trials within judicially manageable limits." *AGC*, 459 U.S. at 543.

Here, apportionment of any damages would be difficult and there would be a risk of duplicative recovery because Plaintiff's theory of liability is indirect and imprecise. Plaintiff had no direct dealings with Defendants but asserts an injury based on alleged conduct that impacted the marketplace generally. Damages would thus have to be calculated based on specific transactions between third parties that were indirectly impacted by Defendants' alleged manipulation of benchmark rates. To the extent that Plaintiff seeks damages based on trading volume, *see* Third Am. Compl. ¶ 124 ("Billions in notional value . . . in Euroyen futures contracts were transacted during the Class Period"), such an approach would be

22

vastly overbroad. *Cf. Gelboim*, 823 F.3d at 779 ("Requiring the [defendant] [b]anks to pay treble damages to every plaintiff who ended up on the wrong side of an independent LIBOR-denominated derivative . . . would . . . also vastly extend the potential scope of antirust liability in myriad markets where derivative instruments have proliferated."). The district court thus correctly concluded that Plaintiff failed to allege antitrust standing.

C.     RICO Claims

1.     *Legal Principles*

The RICO statute criminalizes certain conduct arising from "a pattern of racketeering activity." 18 U.S.C. § 1962(a)-(c). Congress defined "racketeering activity" through numerous state and federal offenses, commonly known as predicates. *See id.* § 1961(1). RICO also provides "a private civil cause of action that allows '[a]ny person injured in his business or property by reason of a violation of section 1962' to sue in federal district court and recover treble damages, costs, and attorney's fees.'" *RJR Nabisco, Inc.*, 579 U.S. at 331 (quoting 18 U.S.C. § 1964(c)) (alteration in original).

"To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of [§] 1962." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (citation omitted). As for this last requirement, "a plaintiff must . . . establish that the underlying § 1962 RICO violation was the proximate cause of his injury." *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 140 (2d Cir. 2018) (cleaned up). "[T]he central question . . . is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

23

As with proximate causation in the antitrust context, we "rarely 'go beyond the first step'" in the causal chain. *Empire Merchs., LLC*, 902 F.3d at 141 (citation omitted); *see also Anza*, 547 U.S. at 459–60 (looking to the directness of injury, "speculative nature of the proceedings," risk of duplicative recoveries, and existence of more immediate victims when analyzing proximate causation in the civil RICO context).

2.    *Analysis*

Plaintiff failed to allege that his proposed RICO claims, premised on wire fraud, *see* 18 U.S.C. § 1343, proximately caused his injury.   As noted above, *see supra* at 20, Plaintiff's alleged injury does not flow directly from the first step in the causal chain.   Not only does Plaintiff fail to allege any direct dealings with Defendants, but his asserted injury (a change in the value of his domestically traded Euroyen TIBOR futures contract) is several steps removed from Defendants' alleged conduct (sending fraudulent Yen-LIBOR submissions to the BBA).   *See id.*   Plaintiff thus cannot establish proximate causation for purposes of his RICO claims for the same reason that he fails to do so for his antitrust claim.[15]

## III.   CONCLUSION

For these reasons, the district court properly dismissed Plaintiff's CEA and antitrust claims and denied leave to add civil RICO claims.   We thus affirm the judgment and orders of the district court and dismiss the cross-appeal.

---

[15] The parties agree that Plaintiff's RICO claims fall or stand with this Court's causation analysis for antitrust standing.

24